2017 WY 124

**BEAR PEAK RESOURCES, LLC, a Texas limited liability company, Appellant (Plaintiff),**

v.

**PEAK POWDER RIVER RESOURCES, LLC, a Wyoming limited liability company, Appellee (Defendant).**

S-16-0268

Supreme Court of Wyoming.

October 13, 2017

Rehearing Denied November 7, 2017

1034

1036

Representing Appellant: Jackie S. Shields and A. Clifford Edwards of Edwards, Frickle & Culver, Billings, Montana; William L. Simpson and Larry B. Jones of Burg, Simpson, Eldredge, Hersh & Jardin, P.C., Cody, Wyoming. Argument by A. Clifford Edwards and Jackie S. Shields.

Representing Appellee: Neil S. Cohen of Fox Rothschild, LLP, Denver, Colorado; Patrick J. Murphy of Williams, Porter, Day & Neville, P.C., Casper, Wyoming. Argument by Mr. Cohen.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

KAUTZ, Justice.

[¶1] Bear Peak Resources, LLC (Bear) and Peak Powder River Resources, LLC (Peak) agreed to work together in acquiring mineral interests for development. Their relationship deteriorated, Peak obtained some mineral interests without compensating Bear, and terminated the parties' agreement. Bear sued Peak, claiming breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, and unjust enrichment. Bear also requested an accounting and asserted a claim for punitive damages. Peak moved for summary judgment which the district court granted, dismissing all of Bear's claims. Bear appealed the district court's decision. We affirm in part, and reverse and remand in part.

## ISSUES

[¶2] Bear raises the following issues in this appeal:

1. Whether the district court misinterpreted the contract and erroneously granted summary judgment dismissing Bear's claim for breach of contract, because genuine issues of material fact exist regarding Peak's wrongful termination of the contract and acquisition of interests in the AMI [area of mutual interest] for its sole benefit in a manner that was contrary to the parties' intent and the terms of the contract.

2. Whether the district court erroneously granted summary judgment dismissing Bear's claim for breach of the implied covenant of good faith and fair dealing, given the evidence that Peak took actions that interfered with Bear's performance of the PSA [purchase and sale agreement] and were inconsistent with the agreed upon purpose of the contract and Bear's justified expectations.

3. Whether the district court erroneously determined Peak had no fiduciary duty and inappropriately granted summary judgment dismissing Bear's claim for breach of fiduciary duty.

4. Whether the district court erroneously granted summary judgment and dismissed

Bear's claim for an accounting when Bear has viable claims for relief.

## FACTS

[¶3] Bear is in the business of acquiring and selling mineral interests and leases, while Peak is in the business of developing oil and gas interests, including the drilling of oil and gas wells. On June 19, 2012, the two entered into a Purchase and Sale Agreement (PSA) wherein Peak agreed to purchase certain oil and gas interests owned by Bear. The PSA included a section which outlined the parties' agreement for procurement of additional mineral interests within an Area of Mutual Interest (AMI) over a two-year term. The agreement contemplated that Bear would acquire oil and gas interests in the AMI, and Bear would then offer Peak the opportunity to purchase the interests from Bear.

[¶4] Although lengthy, recitation of the contract provisions at issue in this appeal will be helpful in putting Bear's claims into context. Specifically at issue is Section 11.3 of the contract, which states in relevant part:

> **Acquisitions in the AMI.** If during the term of the AMI, any Bear Party acquires or has the binding opportunity to acquire any oil and gas leasehold interests, fee title to oil and/or gas interests, royalty interests, overriding royalty interests (other than those contemplated to be reserved by or assigned to Bear under this Agreement), or other interests covering lands within the AMI (hereinafter the "Interests") including, but not limited to, farmout agreements, participation agreements or any other agreements or force pooling notices, actions or ruling through which such Bear Party might acquire (or obtain rights to acquire) an interest in lands within the AMI, such Bear Party shall notify Peak in writing of such acquisition or binding opportunity within thirty (30) business days after the acquisition or binding opportunity arises.
>
> . . . .
>
> Peak shall have a period of thirty (30) days after receipt of such written notice in which to notify the Bear Party, in writing, as to whether it elects to acquire one hun-

dred percent (100%) of the Interest (Peak if it elects to acquire must acquire 100%) under the same terms and conditions as those specified in the written notice related thereto (subject to Section 11.5) for payment of consideration to the Bear Party in the amount of $2,350.00 per net mineral acre covered by the Interest. Peak shall thereafter be entitled to receive, upon payment of $2,350.00 per net mineral acre covered by the Interest which Peak elects to acquire, an assignment of one hundred percent (100%) of the Interest. . . .

> Notwithstanding the foregoing, from and after the Effective Date, prior to any Bear Party acquiring Interests in the AMI, such Bear Party shall consult with Peak and cooperate in good faith with Peak as to (i) the area/lands within the AMI where such Interests are to be acquired; (ii) the terms and conditions pursuant to which such Interests shall be acquired; (iii) the terms and conditions of the oil and gas lease(s)/term assignments covering such Interests, including, but not limited to, the royalties and/or overriding royalties and rentals paid thereunder; (iv) any changes or modifications proposed to the terms of the oil and gas lease/term assignment forms provided by Peak; and (v) the form and substance of all oil and gas leases/term assignments executed covering such Interests. In the event that Peak and Bear cannot agree as to any of the foregoing, after good faith cooperation with one another with regard to the same, Bear and/or Peak may proceed with the acquisition of such Interest provided that Bear shall offer any such Interests to Peak in accordance with the immediately preceding paragraph.

> It is intended that Bear primarily be the acquiring party in the AMI; however, if Peak feels Bear is not performing as expected (such expectations to be on the basis of reasonably [sic] industry standards with respect to the performance Bear is to perform under this article), it shall notify Bear of such lack of performance and the specific details regarding what is expected. Thereafter the parties shall meet to attempt to resolve any issues. If after a reasonable time (not less than

thirty days) after such meeting the performance is not to Peak's satisfaction, reasonably determined, then on not less that fifteen (15) days further notice to Bear (and Bear's continued failure to perform to stated expectations during such notice period), Peak may further notify Bear that Peak may start making acquisitions for its own account in the AMI whereupon, at the expiration of such notice period (and provided Bear is not then performing to Peak's reasonable expectations) (i) Bear shall have no further obligation to make efforts to make acquisitions in the AMI during the AMI Term (but if it does, such acquisitions shall be subject hereto) and (ii) thereafter Peak and/or its officers, employees, agents or affiliates may acquire any leasehold interests, mineral interests or other oil, gas or mineral interests or rights of whatsoever nature or kind within the AMI for Peak's sole account and benefit and Bear shall have no claims, rights or interests of any kind in or to any such Interests acquired by Peak through Peak's efforts. Notwithstanding the foregoing in the event Peak has proposed a well and one or more of the other working interest owners in the proposed pool or unit (who has not been identified and who is not in current conversations with Bear about the interest) contacts Peak directly about entering into a transaction with Peak regarding transferring to Peak some or all of their working interest in the pool or unit, whether through farmout, direct acquisition or otherwise, such interest if acquired by Peak shall be for Peak's sole account and benefit, free of any rights of Bear hereunder. Similarly, if Bear has identified and is under negotiations with, a similarly situated third party, the acquisition, even if made by Peak, shall be deemed an acquisition through Bear for which Bear is entitled to its full compensation as set out in the Section 11.3.

[¶5] During the term identified in the PSA, Peak acquired several mineral interests in the AMI without Bear's assistance and Peak did not compensate Bear for those interests. Additionally, before the term would have expired on its own, Peak took steps to terminate the AMI provision in the PSA. On May 1, 2013, Peak issued a Notice of Non-Performance letter to Bear, wherein Peak notified Bear it was not performing its obligations in the PSA based on reasonable industry standards. The parties met to discuss the issue on May 21, 2013, and on June 18, 2013, Peak sent Bear a letter stating that Bear's performance continued to fail to meet the terms of the PSA and reasonable industry standards. On July 11, 2013, Peak notified Bear that Bear continued to fail to perform and, therefore, based on the terms of the PSA, Peak was entirely free to obtain leases or other interests without paying Bear.

[¶6] Bear filed a complaint against Peak alleging breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, and unjust enrichment. Bear also sought an accounting and punitive damages. Peak moved for summary judgment and argued that all of the mineral interests it acquired without the assistance of Bear were permitted by the terms of the PSA and, therefore, it did not breach the terms of the agreement or the implied covenant of good faith and fair dealing, nor did it engage in negligent misrepresentation or benefit from unjust enrichment. Further, Peak argued that the PSA did not create a fiduciary relationship between the parties, thus, Peak could not have breached any fiduciary duties to Bear. In support of its motion, Peak attached a copy of the PSA, a list of mineral interest acquisitions and how much Bear was owed for each acquisition, and some witness affidavits.

[¶7] In response, Bear requested that the district court strike the majority of Peak's affidavits, claiming they contained inadmissible information and conclusory statements. Bear argued that, because the affidavits were deficient, Peak had failed to submit materials to support a prima facie showing that it was entitled to summary judgment. Bear also submitted interrogatory responses which it claimed demonstrated a genuine issue of material fact, precluding summary judgment in favor of Peak.

[¶8] Peak responded with additional affidavits and documents, which Bear also moved to strike. The district court determined all the affidavits submitted by Peak were generally proper for consideration; however, the court determined that limited portions of the affidavits were conclusory in nature or based on hearsay statements and stated that it would not consider those paragraphs when considering Peak's motion.

[¶9] The district court then determined Peak was entitled to summary judgment. It first concluded that the PSA was unambiguous, and to the extent certain sections of the PSA may have been ambiguous, that ambiguity did not affect the issues before the court. The court then analyzed whether each of Peak's interest acquisitions was permissible under the terms of the PSA, and determined that Peak was entitled to summary judgment on each of those claims. The court also determined Peak was entitled to summary judgment on the breach of the implied covenant of good faith and fair dealing claim, and, as a matter of law, Peak did not have a fiduciary relationship with Bear. Finally, the court entered summary judgment on the negligent misrepresentation and unjust enrichment claims because Bear did not provide a response in opposition to Peak's request for summary judgment on those claims, and the court concluded that Bear was not entitled to an accounting. Bear filed a timely notice of appeal.

## STANDARD OF REVIEW

[¶10] This Court reviews a district court's order granting summary judgment *de novo*.

> [W]e review a summary judgment in the same light as the district court, using the same materials and following the same standards. *Snyder v. Lovercheck*, 992 P.2d 1079, 1083 (Wyo. 1999); *40 North Corp. v. Morrell*, 964 P.2d 423, 426 (Wyo. 1998). We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Id.* A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Id.* If the moving party presents supporting summary judgment materials demonstrating no genuine issue of material fact exists, the burden is shifted to the non-moving party to present appropriate supporting materials posing a genuine issue of material fact for trial. *Roberts v. Klinkosh*, 986 P.2d 153, 155 (Wyo. 1999); *Downen v. Sinclair Oil Corp.*, 887 P.2d 515, 519 (Wyo. 1994).

*Rogers v. Wright*, 2016 WY 10, ¶ 7, 366 P.3d 1264, 1269 (Wyo. 2016) (quoting *Inman v. Boykin*, 2014 WY 94, ¶ 20, 330 P.3d 275, 281 (Wyo. 2014)).

## DISCUSSION

### Contract Ambiguity

[¶11] Bear argues the district court erroneously concluded the PSA was unambiguous and then misapplied the terms of the PSA to the facts and circumstances presented by the parties. Bear argues that, while the PSA specifies certain instances in which Peak may acquire interests for its sole benefit without compensating Bear, the PSA is silent regarding Peak's acquisition of interests that fall outside of the specified instances, rendering the PSA ambiguous. Bear also claims the phrase "proposed a well" found in the final paragraph of section 11.3 renders the PSA ambiguous because that phrase is a term of art in the oil and gas industry and, thus, the court should have relied on extrinsic evidence to define it. According to Bear, the district court's interpretation of that phrase gave Peak unfettered opportunities to acquire interests for its sole benefit, despite the limitations the parties had agreed to and included in the PSA.

[¶12] When reviewing a contract, we begin by looking at the plain language of the document. *Thornock v. PacifiCorp*, 2016 WY 93, ¶ 13, 379 P.3d 175, 180 (Wyo. 2016). [T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo. 1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four

corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co. [v. Texaco]*, 882 P.2d [212,] 220 [ (Wyo. 1994) ]; *Prudential Preferred Properties [v. J and J Ventures]*, 859 P.2d . [1267,] 1271 [ (Wyo. 1993) ]. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 539 (Wyo. 1996).

*Id.* (quoting *Claman v. Popp*, 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012)) (brackets in original). Only if a contract is ambiguous and its meaning is doubtful or uncertain will courts turn to extrinsic evidence and the rules of contract construction. *Wolter v. Equitable Resources Energy Co., Western Region*, 979 P.2d 948, 952 (Wyo. 1999). The fact that· the parties disagree about the meaning of a term in the contract does not render the agreement ambiguous or justify the use of extrinsic evidence. *Id.*; *Claman*, ¶ 27, 279 P.3d at 1013.

[¶13] A review of the PSA makes it clear that the terms in Section 11.3 allowed Peak to acquire interests without any obligation to Bear only in three specific circumstances. First, Section 11.3 permits Peak to acquire leases or other interests directly from owners if Peak and Bear cannot agree, in good faith, on necessary terms of the leases or other interests. The PSA requires that, before acquiring interests in the AMI, Bear consult with and cooperate in good faith with Peak about those terms. However, "[i]n the event that Peak and Bear cannot agree as to any of the foregoing [lease or· other interest terms], after good faith cooperation with one another with regard to the same, Bear and/or Peak may proceed with the acquisition of such Interest provided that Bear shall offer any such Interests to Peak in accordance with the immediately· preceding paragraph." This plain language allows Peak to acquire an interest without the assistance of Bear if the parties had first cooperated with each other in good faith and still failed to agree on the necessary conditions.

[¶14] Next, the PSA states that Peak can acquire a lease or other mineral interest directly from the interest owner, without involving Bear, if the AMI agreement is "terminated". The third paragraph of Section 11.3 explains the basis and process for "termination." Once Peak properly invokes and follows ·the termination procedure, "Peak and/or its officers, employees, agents or affiliates may acquire any leasehold interests, mineral interests or other oil, gas or mineral interests or rights of whatsoever nature or kind within the AMI for Peak's sole account and benefit and Bear shall have no claims, rights or interests of any ·kind in or to any such Interests acquired by Peak through Peak's efforts." This portion of the PSA ·is clear that, once the termination procedure has taken place, Peak is at liberty to acquire any interests whatsoever and that Bear would receive no benefit or payment from the acquisition.

[¶15] Finally, Peak may, in some instances, acquire interests without involving Bear if Peak has "proposed a well." Section 11.3 states that if Peak has "proposed a well" and a working interest owner in the proposed pool or unit for that well (who has not been identified by Bear and is not in current conversations with Bear about the interest) contacts Peak directly about entering into a transaction, Peak can acquire that owner's interest for its sole account and benefit, and Bear is not entitled to any compensation. However, the PSA is equally clear that, if Bear had identified and was in negotiations about the interest with the working interest owner, then Bear is entitled to full compensation under the terms of the PSA, even if Peak acquired the interest directly.

[¶16] While each of these instances is clearly stated in the PSA, Bear nonetheless argues the agreement is ambiguous because it is silent with regard to whether Peak is at liberty to acquire interests without Bear's involvement in circumstances other than those stated in the PSA. Bear seems to believe that without, further definition, the agreement is ambiguous because Peak could acquire any interests it desires. We disagree.

[¶17] When considering the terms of the agreement, we read the contract as a whole to find the plain meaning of all the provisions, and we avoid interpreting provisions in a way that would render any other

portion of the agreement inconsistent or meaningless. *Thornock*, ¶ 13, 379 P.3d at 180. Here, the agreement explicitly states the parties intend "that Bear primarily be the acquiring party in the AMI[.]" The fact that the agreement contains limited and specific circumstances in which it is appropriate for Peak to seek interests without the assistance of Bear is consistent with the overall intent of the agreement—that Bear will be securing the interests for Peak to purchase, except in the three situations described in 11.3.

[¶18] Bear cites *Sheridan Fire Fighters Local No. 276 v. City of Sheridan*, 2013 WY 36, ¶ 23, 303 P.3d 1110, 1117 (Wyo. 2013), to support its argument that the contract's silence on this issue results in ambiguity. In *Sheridan Fire Fighters*, the collective bargaining agreement included a grade and step system that established pay grades, but was silent as to how an employee would move up a step. *Id.*, ¶ 12, 303 P.3d at 1115. We recognized that "where a contract is 'silent' on some significant point, 'the terms of the contract are obviously unclear.'" *Id.*, ¶ 23, 303 P.3d at 1117. However, the failure to include terms explaining how the grade and step system is designed to work in *Sheridan Fire Fighters* is quite different than what Bear claims is silence in the PSA.

[¶19] Bear claims that Section 11.3 is ambiguous because it does not explicitly prohibit Peak from directly acquiring mineral interests except in the three circumstances described above. That "silence," according to Bear, could result in an interpretation that Peak can acquire mineral interests in any other situation without compensating Bear. Such an interpretation is unreasonable because it would render the entirety of Section 11.3 meaningless. *See Thornock*, ¶ 13, 379 P.3d at 180. If Peak could acquire any mineral interests in the AMI under any circumstances, without any obligation to compensate Bear, there would have been no reason for the parties to include the three specific circumstances in the PSA. Section 11.3 is unambiguous on this point. Under the contract, the only circumstances in which Peak could acquire interests in the AMI without an obligation to pay Bear are the three specified circumstances discussed above.

▰▰▰▰ [¶20] Bear also argues that the agreement is ambiguous because it uses the phrase "proposed a well." Bear claims that phrase has a specialized meaning within the oil and gas industry that is different from its ordinary meaning. For that reason, Bear claims, the district court should not have granted summary judgment. Instead, it should have considered extrinsic evidence to determine the proper definition of the phrase *See generally Hickman v. Groves*, 2003 WY 76, 71 P.3d 256 (Wyo. 2003); *Caballo Coal Co. v. Fidelity Exploration & Production Co.*, 2004 WY 6, 84 P.3d 311 (Wyo. 2004); *Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, 126 P.3d 909 (Wyo. 2006); *Ultra Resources, Inc. v. Hartman*, 2010 WY 36, 226 P.3d 889 (Wyo. 2010); *Ecosystem Resources, L.C. v. Broadbent Land & Resources, LLC*, 2012 WY 49, 275 P.3d 413 (Wyo. 2012); *Berthel Land and Livestock v. Rockies Exp. Pipeline LLC*, 2012 WY 52, 275 P.3d 423 (Wyo. 2012). However, Bear has not provided any evidence that supports its assertion that "proposed a well" has a specialized or technical meaning. Unsupported assertions in a responsive pleading are insufficient to establish that a material fact is in dispute:

W.R.C.P. 56(d) provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." "Further, we have held that conclusory statements, mere opinions, or categorical assertions of ultimate facts without supporting evidence are insufficient to establish some disputed issue of material fact." *Clark v. Industrial Co. of Steamboat Springs, Inc.*, 818 P.2d 626, 628 (Wyo. 1991) (quoting *TZ Land & Cattle Co. v. Condict*, 795 P.2d 1204, 1208 (Wyo. 1990) and *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo. 1987)); *Seamster v. Rumph*, 698 P.2d 103, 106 (Wyo. 1985). Any evidence relied upon to "sustain or defeat a motion for summary judgment must be such as would be admissible at trial and that it should be as carefully tailored and professionally cor-

rect as any evidence which would be presented to the court at the time of trial." *Equality Bank of Evansville, Wyo. v. Suomi*, 836 P.2d 325, 330 (Wyo. 1992).

*In re Estate of McLean*, 2004 WY 126, ¶ 15, 99 P.3d 999, 1004-05 (Wyo. 2004); *see also Loredo v. Solvay America, Inc.*, 2009 WY 93, ¶ 10, 212 P.3d 614, 619 (Wyo. 2009).

[¶21] In its motion for summary judgment, Peak argued that the plain language of the PSA was unambiguous, and Bear failed to present any evidence that suggested "proposed a well" carried a specialized or technical meaning in the oil and gas industry. Without any evidence indicating that the phrase had some special meaning in the industry, it was appropriate for the district court to conclude that the term is unambiguous, and resort to using common definitions. The common and everyday definition of "propose" is:

> 1: to form or put forward a plan or intention ... 2: to engage in talk or discussion ... 1a: to set before the mind (as for discussion, imitation, or action) b: to set before someone and esp. oneself as an aim or intent 2a: to set forth for acceptance or rejection ....

*Merriam Webster's Collegiate Dictionary* 936 (10th ed. 1995). A "well" is defined as: "a shaft or hole sunk to obtain oil, brine, or gas." *Id.* at 1342. Therefore, the terms of the PSA unambiguously allowed Peak to obtain a mineral interest without compensation to Bear if Peak had put forward a plan or intention to drill an oil and gas well, was contacted directly by the working interest owner, and Bear had not identified and was not in current conversations with the interest owner about the mineral interest.

### Interpretation of Termination Clause

[¶22] In July 2013, Peak terminated its agreement with Bear in the AMI. Section 11.3 allowed Peak to take steps to terminate the AMI if "Peak feels Bear is not performing as expected (such expectations to be on the basis of reasonably [sic] industry standards with respect to performance Bear is to perform under this article)[.]". In its response to the motion for summary judgment, Bear argued that Peak failed to make a prima facie showing that Bear was not performing as expected under reasonable industry standards and, therefore, summary judgment was not appropriate. The district court stated the following with respect to "reasonable industry standards":

> Clearly, the control in this paragraph is placed fundamentally with Peak, and both parties agreed to its provisions. Bear argues that Peak has not proven what "reasonable industry standards" are with respect to Bear's performance expectations under the PSA. The court finds, however, that this is of little consequence. Given the context of the paragraph and specifically the phrases "if Peak feels Bear is not performing as expected" and "to Peak's satisfaction," the court finds the contract is sufficiently vague as to leave the question of Bear's performance standards open to Peak to determine.

[¶23] We cannot agree with the district court's conclusion. Although cited *supra*, ¶ 4, we will restate the applicable portion of the agreement to put the phrase "reasonable industry standards" into context:

> It is intended that Bear primarily be the acquiring party in the AMI; however, if Peak feels Bear is not performing as expected (such expectations to be on the basis of **reasonably** [sic] **industry standards** with respect to the performance Bear is to perform under this article), it shall notify Bear of such lack of performance and the specific details regarding what is expected. Thereafter the parties shall meet to attempt to resolve any issues. If after a reasonable time (not less than thirty days) after such meeting the performance is not to **Peak's satisfaction, reasonably determined,** then on not less than fifteen (15) days further notice to Bear (and Bear's continued failure to perform to stated expectations during such notice period), Peak may further notify Bear that Peak may start making acquisitions for its own account in the AMI whereupon, at the expiration of such notice period (and provided Bear is not then performing to **Peak's reasonable expectations**) ....

(emphasis added).

[¶24] There is nothing vague about the language used in the agreement. It explicitly

states that Peak's expectations must be based on reasonable industry standards. Further, when the phrase "Peak's satisfaction" is used, it is followed by the phrase "reasonably determined." Peak's satisfaction must be reasonable according to industry standards. Finally, when the agreement mentions "Peak's reasonable expectations," it is only logical that the reasonable basis for those expectations relates back to industry standards. Interpreting this language to mean that Bear's performance standards are left entirely to the discretion of Peak would render the parties' specific reference to reasonable industry standards completely meaningless. *See Thornock*, ¶ 13, 379 P.3d at 180 ("We avoid interpreting provisions in a way that makes the other provisions inconsistent or meaningless.").

[¶25] Peak sought summary judgment claiming, among other things, that it had properly terminated the AMI, and that it obtained some of the challenged mineral interests after that termination. Proper termination of the AMI depended, in part, on whether Peak's expectations were reasonable based on industry standards. It was imperative for the district court to consider "reasonable industry standards" before it could conclude Peak was entitled to judgment as a matter of law on this issue.

[¶26] Peak and Bear disagree about which party carried the burden of establishing reasonable industry standards for purposes of deciding Peak's motion for summary judgment. Bear argues it was Peak's burden, as Peak was the party seeking summary judgment. In contrast, Peak argues it was Bear's burden as the plaintiff to present evidence that established Peak breached the contract by not acting in accord with reasonable industry standards. A review of our summary judgment standard easily settles this dispute.

[¶27] Wyoming Rule of Civil Procedure 56(a) allows a court to enter judgment as a matter of law if the party seeking summary judgment can establish there is no genuine dispute as to any material fact. "A genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have

asserted." *Loredo*, ¶ 10, 212 P.3d at 618-19. The party seeking summary judgment carries the initial burden of establishing a prima facie case for summary judgment. *Id.*, ¶ 10, 212 P.3d at 619. A "prima facie case" is defined as: "1. The establishment of a legally required rebuttable presumption. 2. A party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Black's Law Dictionary* 1382 (10th ed. 2014). If the moving party can present sufficient evidence to satisfy this burden, the burden then shifts to the party opposing summary judgment to produce specific facts that create a genuine issue of material fact. *Loredo*, ¶ 10, 212 P.3d at 619.

[¶28] Because Peak is the party seeking summary judgment, it carried the initial burden of presenting facts to establish a prima facie showing that there are no material facts in dispute. In its motion, Peak argued it had properly terminated the AMI and, therefore, it was at liberty to acquire any mineral interests within the AMI it desired without compensation to Bear. Further, Peak argued that it, in fact, acquired some of the interests in dispute after the termination. Peak did not provide any facts, however, that established the termination was proper, despite its knowledge that Bear claimed Peak had improperly terminated the AMI. While Bear did not specifically mention the termination in its breach of contract claim, ¶ 28 of the complaint states: "Peak first notified Bear of its disapproval of Bear's performance under the terms of the PSA on May 1, 2013, and after a meeting and subsequent July 11, 2103 notice of continued disapproval, Peak wrongfully terminated the PSA on July 26, 2013."

[¶29] Therefore, whether Peak properly terminated the AMI is a potentially dispositive issue. As discussed above, in order for the district court to determine whether the termination was proper, it had to consider reasonable industry standards. The question of what constitutes reasonable industry standards is a material fact that could establish or refute whether the termination was proper. *See Loredo*, ¶ 10, 212 P.3d at 618-19. For that reason, Rule 56 required Peak to make a prima facie showing that its expectations of Bear's performance were in accord with rea-

sonable industry standards. Only after that showing had been made did the burden shift to Bear to produce competent, admissible evidence demonstrating that Bear's performance did fall within reasonable industry standards. Because Peak did not present any evidence on that material fact, the burden never shifted to Bear to refute it.[1]

[¶30] Although the district court erroneously granted summary judgment in favor of Peak on this issue, only some of the transactions Bear complains of occurred after the "termination." Bear's claims cannot stand if the undisputed evidence indicates that any of the three contract conditions releasing Peak from the obligation to pay Bear exist. Consequently, the district court appropriately considered all of the disputed acquisitions as if the AMI had not been terminated. Reversal of summary judgment will only be necessary if there are issues of fact as to whether Peak acquired the mineral interests within one of the established avenues described in the PSA. We will now discuss each of the acquisitions individually.

[¶31] Bear alleged in its complaint that Peak had acquired forty separate mineral interests in the AMI without paying Bear as required by the PSA. By the time of Peak's motion for summary judgment, however, Bear had admitted that it had been properly paid for thirty-three of those transactions, leaving only seven in dispute. Those seven claims are discussed in order, using the titles given them by the parties.

### i. Davis Deal

[¶32] Peak directly acquired a mineral interest within the AMI from Randall Davis, and did not pay Bear. In its motion for summary judgment, Peak argued that Bear was not entitled to compensation for the "Davis Deal" for two reasons. First, Peak

acquired the mineral interest from Mr. Davis on January 4, 2014, which was approximately six months after Peak had terminated its agreement with Bear. Additionally, Peak asserted the lease was acquired after it had proposed a well in the area and it had no information that would suggest Bear had been in communication with Mr. Davis; therefore, Bear would not have been entitled to compensation even under the agreement. In support of that argument, Peak provided the affidavits of Matthew Gray and Glen Christiansen, the well proposal sent from Peak to Mr. Davis, a spreadsheet kept by Bear that identified individuals and entities Bear had contacted regarding mineral interests (which did not include Mr. Davis), and an interrogatory answer in which Bear could not recollect any conversations it had with Mr. Davis.

[¶33] In its response to the motion, Bear exclusively relied upon the argument that the affidavits Peak submitted in support of summary judgment were improper and should be stricken and, therefore, Peak failed to make a prima facie showing that Peak had properly terminated the AMI. Bear did not produce any evidence that demonstrated a genuine issue of material fact, either with respect to Peak's termination of the AMI or that Peak properly had acquired the interest after proposing a well. Further, Bear did not include any information in its Rule 56.1 submission that would have led the court to believe there was a genuine issue of material of fact on any issue relating to this mineral interest.[2]

[¶34] On appeal, Bear makes two arguments that it did not raise to the district court. First, Bear argues the record includes material that shows a genuine issue of material fact. Specifically, Bear points to one of its responses to Peak's first set of interrogatories. Request No. 4 stated:

1. To be clear, this burden is applicable because Peak moved for summary judgment. At trial, the burden will be on Bear, as the plaintiff, to demonstrate Peak improperly terminated the AMI, which would require showing that Peak's expectations of Bear's performance were not in accord with reasonable industry standards.

2. Wyoming Rule of Civil Procedure 56.1(b) requires: "In addition to the materials opposing a

motion for summary judgment, there shall be annexed a separate, short and concise statement of material facts as to which it is contended that there exists a genuine issue to be tried." Rule 56.1(c) adds: "Such statements shall include pinpoint citations to the specific portions of the record and materials relied upon in support of the parties' position."

(a) **Request No. 4.** Admit that from June 2012 through the end of the AMI[, y]ou were not in "current conversations" with Randall William Davis about acquiring the interest listed on the spreadsheet attached hereto as **Exhibit B.**

Bear answered:

(b) This interest was presented on the final invoice of June 21, 2013. A lease was acquired on or about September 8, 2012 for this interest. Further Plaintiff had paid for the acquisition of the lease.

(c) The primary individuals with knowledge on this interrogatory are: Norman Napier, Member, Bear Peak Resources, LLC; Christopher Fling, Member, Bear Peak Resources, LLC; Mark Newendorp, Member, Bear Peak Resources, LLC; all c/o Plaintiff's Counsel.

(d) Among the documents supporting this position are the final invoice of June 21, 2013, the lease that was obtained, and the payment record for the interest.[3] In addition there may be other records supportive. Plaintiff is still reviewing records, and this response will be supplemented upon completion of that review.

Bear argues this answer established a genuine issue of material fact because it counters documents submitted and relied on by Peak to demonstrate Bear never informed Peak of conversations or negotiations with Mr. Davis.

[¶35] While we may find some merit to this argument under normal circumstances, Bear is raising this argument for the first time on appeal. We have repeatedly stated that we will not consider issues that are raised for the first time on appeal. *Wyoming Bd. of Land Comm'rs v. Antelope Coal Co.*, 2008 WY 60, ¶ 16, 185 P.3d 666, 670 (Wyo. 2008). Further, the record does not contain any facts that would support a legitimate explanation of why this argument was not raised in the district court. Although Peak did not provide extensive briefing on the issue in its motion for summary judgment, it clearly stated that it "acquired the Davis Deal through its sole efforts after proposing a well." Similarly, in its reply brief, Peak made the same assertion and pointed out that Bear

had not provided any evidence that Bear had participated in the acquisition. Thus, Peak's allegation that it properly acquired the mineral interests after proposing a well had been squarely presented to Bear. For whatever reason, Bear chose not to argue there was a genuine issue of material fact even though it had submitted materials that may have supported the argument. Finally, while these documents were included in the materials submitted at the summary judgment phase, we cannot fault the district court for not discovering, *sua sponte*, less than one page of information contained within almost 700 pages of documents when neither party brought this information to the court's attention. "Judges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *see also* W.R.C.P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record"). Therefore, we decline to consider Bear's argument on this matter.

[¶36] In its second new argument on appeal, Bear claims Peak failed to make a prima facie showing that Mr. Davis contacted Peak in response to Peak's well proposal. Paragraph 34 of Mr. Gray's November 19, 2015 affidavit states: "As a result of receiving Peak's well proposal, through telephone communication, Randall William Davis and Peak were in communication regarding leasing this mineral interest to Peak." Bear asserts that, while this statement establishes that Peak and Mr. Davis had communication, it does not establish Mr. Davis contacted Peak directly about the transaction, as required by the terms of the PSA.

[¶37] While it is tempting to decline to consider this argument as well, it sits in a different posture from the first argument. Peak was required to make a prima facie showing that it was entitled to judgment as a matter of law—i.e. that it had properly acquired the interest from Mr. Davis after it had proposed a well, that Mr. Davis had contacted Peak directly, and that Mr. Davis had not been identified and was not in current conversations with Bear about the interest. Peak had to make this showing before

---

**3.** These documents arc not contained in the record on appeal.

the burden shifted to Bear to demonstrate a genuine issue of material fact. Thus, this was a threshold evidentiary showing Peak was required to demonstrate.

[¶38] Per our standard of review, we are required to review the district court's decision de novo, using the same materials and standards as the district court. Thornock, ¶ 10, 379 P.3d at 179. Those standards require us to "examine the record from the vantage point most favorable to the party opposing the [summary judgment] motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record." Id. When looking at the issue presented here, this Court must determine whether the statement, "As a result of receiving Peak's well proposal, through telephone communication, Randall William Davis and Peak were in communication regarding leasing this mineral interest to Peak[,]" demonstrates Mr. Davis contacted Peak directly about the interest.

[¶39] The inference could certainly be made that because of Peak's well proposal, Mr. Davis contacted Peak and the two began communications regarding the mineral interest. However, an equally plausible inference is that Peak initiated contact with Mr. Davis after it had sent the well proposal. The latter inference is favorable to Bear, as it would not support a conclusion that Peak properly acquired the mineral interest. Because our standard of review requires we give Bear the benefit of all favorable inferences that may fairly be drawn from the record, we cannot conclude that Peak made a prima facie showing Mr. Davis contacted Peak directly.

[¶40] Relying on the contract doctrine of substantial performance, Peak argues this is a technical, minor defect that we should overlook because Peak substantially complied with the terms of the PSA. We disagree. "The doctrine of substantial performance allows a party that has substantially complied with a contract to recover for its performance despite the fact that it has breached the contract by failing to comply fully with its terms." 15 Williston on Contracts § 44:58 (4th ed. 2017). The doctrine applies to bilateral contracts that call for an exchange of performances and one party's performance is a constructive condition precedent to the other's party's duty to render the return performance promised. Id. § 44:52. The doctrine is rooted in fairness and "is intended to protect a party's right to be compensated when it has performed in all material and substantive respects and to avoid the possibility of a forfeiture due to technical, minor, inadvertent, or unimportant deficiencies." Id.

[¶41] This is not a situation in which Peak has substantially performed a constructive condition precedent that triggered Bear's obligation to perform a promise. Thus, the doctrine of substantial performance does not apply. The parties agreed to certain situations where Peak could obtain mineral interests without compensation to Bear, and one of those limited circumstances included the requirement that the interest owner contact Peak. The parties put this requirement into the agreement for a reason—most likely for Bear's protection. We refuse to judicially rewrite the terms of a contract by ignoring a clear and unambiguous requirement to which the parties agreed.

[¶42] Because Peak failed to make a prima facie showing that it had properly terminated the AMI, it was required to show that it acquired the Davis Deal in compliance with the other terms of the PSA. While Peak had proposed a well, it failed to demonstrate that Mr. Davis contacted Peak directly about the transaction. For these reasons, the district court erroneously granted summary judgment in favor of Peak on this transaction.

### ii. Myco Agreements

[¶43] Peak obtained mineral interests from Myco Industries, Inc. (Myco) before it terminated the AMI. Peak sought summary judgment regarding the Myco mineral interests on the basis it had proposed a well. In support of its assertion, Peak provided Matthew Gray's affidavit, a copy of the well proposal it sent to Myco, e-mails between Matthew Gray and a representative from Myco which demonstrated that Myco contacted Peak about the mineral interests, and the resulting farmout agreement between Myco and Peak. In response, Bear argued that Peak had failed to make a prima facie showing for summary judgment

because Matthew Gray's affidavit was improper. Bear also claimed its interrogatory responses reveal it had been in ongoing negotiations with Myco at the time Peak entered into the farmout agreement. In Interrogatory No. 12, Peak requested:

> For each Interest that Bear claims compensation is owed under the PSA, describe in detail each conversation Bear or its agents or representatives had with each corresponding Interest owner in the AMI. In responding to this interrogatory, for each conversation please identify the first date of the conversation, the person or persons at Bear involved in the conversation, the person or persons Bear conversed with, the substance of the conversation, the description of the relevant lands by section, township, range and any other legal description, the last date Bear conversed with that person or persons, and whether Bear acquired, or had a binding opportunity to acquire, an Interest from that person or persons.

In response to the interrogatory, Bear asserted the following with respect to communications with Myco:

(II) Myco Farmout

Chris Fling had conversations with Myco representative Janet Richardson in late 2012 concerning acreage within a proposed well with the intent of either having them lease or participate. Chris Fling also had a conversation with Mike Kozaminko of the Denver office concerning the same topic at approximately the same time. In addition, Chris Fling visited the office in Spring, 2013 and spoke with Bernie Floore, [C]huck Moran and Kathy Porter.

[¶44] The district court concluded that Peak secured the mineral interest after proposing a well and being contacted directly by Myco. The court also concluded that Bear had failed to bring forth specific facts that would demonstrate a genuine issue of material fact with respect to whether Bear had been in current conversations with Myco about the interests. While the court pointed out Bear had claimed to have been in conversations with Myco in late 2012 and Spring 2013, it determined that claim was overborne by the information submitted by Peak. This

included the fact that Bear had not included Myco in an August 29, 2012 e-mail response to Peak about mineral owners Bear had contacted, and Myco did not appear on a weekly reporting summary provided by Bear to Peak.

[¶45] Bear argues the district court failed to view the evidence, and the reasonable inferences that could be drawn therefrom, in the light most favorable to Bear and, instead, made credibility determinations on the quality of Peak's evidence versus Bear's evidence. While we agree it is not appropriate for courts to make credibility determinations at the summary judgment stage, we cannot agree that the district court improperly weighed evidence or credibility on this issue. The information provided by Bear simply did not demonstrate a genuine issue of material fact. *See Cordova v. Gosar*, 719 P.2d 625, 639-40 (Wyo. 1986). Bear's interrogatory response shows only that it communicated with Myco in late 2012 and the spring of 2013; however, the evidence submitted by Peak shows it completed its transaction with Myco before then. Peak sent the well proposal to Myco on August 6, 2012, Myco contacted Peak on September 11, 2012, and they entered into the farmout agreement on September 19, 2012.

[¶46] Peak provided the district court with other unrefuted evidence that Bear was not in communication with Myco during the relevant time period. The district court correctly pointed out Myco was not included in the applicable weekly reporting spreadsheet Bear provided to Peak. Further, in an e-mail string taking place over August 29 and September 22, 2012—the time period directly relevant to Peak's well proposal—Peak asked Bear's representative, Christopher Fling, to identify interest owners Bear had contacted. Mr. Fling responded to that request with a list of interest owners, and that list did not include Myco.

[¶47] Curiously, on appeal Bear relies on another interrogatory response which was not included in its Rule 56.1 disclosure as evidence of "current conversations" with Myco. That response references a September 22, 2012 e-mail string between Mr. Fling and Mr. Gray, and Bear claims Mr. Fling identi-

fied Myco to Mr. Gray as an entity with whom Bear was in contact. However, Bear did not attach that e-mail to the interrogatory response, nor can this Court locate the e-mail within the documents submitted by Bear. Thus, we can only assume this is the same September 22, 2012 e-mail that Peak submitted, which clearly does not support Bear's claim that it had notified Peak that Bear had been in contact with Myco.

[¶48] Peak provided a prima facie showing that Myco contacted Peak about the farmout agreement after Peak proposed a well. Further, Peak provided documents that established Bear had not identified Myco as an entity with whom Bear had been in contact. While Bear presented evidence it had been in contact with Myco in late 2012 and spring 2013, those conversations occurred after Peak had entered into the farmout agreement with Myco. Thus, the information provided by Bear did not create a genuine issue of material fact, and the district court properly granted summary judgment on this issue.

### iii. WPX Deal

[¶49] Bear's complaint alleges Peak obtained an interest from WPX, obligating Peak to pay Bear under the terms of the PSA. In its motion for summary judgment, Peak argued that although in this particular location it force pooled 0.57211 net mineral acres owned by multiple unleased mineral owners, WPX was not one of those owners. Instead, WPX elected to participate in the well and, therefore, Peak never acquired an interest from WPX. In support of this assertion, Peak relied on Matthew Gray's affidavit. Bear's only response to that argument was that Peak had provided no evidence to support its assertions because Mr. Gray's affidavit was improper and should be stricken. The district court determined that Peak was entitled to summary judgment because there was never a transaction between Peak and WPX and, consequently, Bear could not be entitled to compensation from Peak.

[¶50] On appeal, Bear specifically states it is not conceding that Peak did not obtain an interest from WPX. However, other than that statement, Bear does not provide any facts or argument that would support a finding that Peak did acquire an interest from WPX. Instead, Bear argues that, even if Peak did not acquire an interest from WPX, the fact that Peak force pooled the 0.57211 net mineral acres owned by other mineral interest owners was a breach of the PSA. Bear's argument on this claim does not cite to clauses in the PSA which would prohibit Peak's conduct or require Peak to compensate Bear in this situation. We refuse to consider arguments that are not supported by cogent argument and citation to the record or legal authority. *Hamburg v. Heilbrun*, 889 P.2d 967, 968 (Wyo. 1995). Additionally, we decline to consider this argument because it is being raised for the first time on appeal. *Antelope Coal Co.*, ¶ 16, 185 P.3d at 670.

### iv. Samson Deal Prior to Black Butte

[¶51] In response to Bear's claim it should be paid for the mineral interests obtained from Samson, Peak's unrefuted evidence showed that there had been two separate transactions with Samson—one that involved Bear (Samson Black Butte) and an earlier one that did not (Samson Deal Prior to Black Butte). Peak demonstrated it acquired the mineral interests referred to as the "Samson Deal Prior to Black Butte" after Peak had proposed a well, Peak was contacted by Samson, and Samson had not been in contact with Bear about the interest. Peak submitted documents demonstrating Peak had paid Bear $464,986.65 for the transaction which involved Bear (Samson Black Butte). In its Rule 56.1 statement, Bear claimed a genuine issue of material fact on the "Samson Deal Prior to Black Butte" is found in its response to Peak's Interrogatory No. 12 (quoted *supra*, ¶ 43). Bear maintains the response demonstrates that Bear was having discussions with Samson about the particular mineral interest at issue:

(IV) Sampson Deal prior to the Black Butte

Chris Fling had a conversation with Pete Young in their Tulsa office concerning who to talk to in Denver, who he called, but the names are unknown at this time. Chris

Fling also talked with Robert Schafiteded in the Tulsa Office.

The district court concluded that Peak had made a prima facie showing that, while there were two transactions with Samson, the transaction known as "Samson Deal Prior to Black Butte" occurred after Samson contacted Peak in response to Peak's well proposal. The court determined the interrogatory response provided by Bear did not demonstrate a genuine issue of material fact about whether Bear was in discussions with Samson at the time of this transaction because Bear did not dispute there were two different Samson transactions. Consequently, although the interrogatory response indicated some communication had occurred between Bear and Samson, it did not show that the communication was related to the "Samson Deal Prior to Black Butte." It could have been connected with "Samson Black Butte"—the transaction for which Bear had been paid.

[¶52] On appeal, Bear relies upon additional interrogatory responses and various e-mails in the record it claims create a genuine issue of material fact with respect to "Samson Deal Prior to Black Butte." However, these arguments are being raised for the first time on appeal, and we decline to consider them. *Antelope Coal Co.*, ¶ 16, 185 P.3d at 670. When reviewing the arguments and materials the parties relied upon before the district court, we agree that Peak presented a prima facie showing and the interrogatory response relied upon by Bear failed to create a genuine issue of material fact.

### v. Dr. Wood MD Family Trust Deal

 [¶53] Peak argued that its acquisition of the mineral interests from the Dr. Wood MD Family Trust was the result of a well proposal. In support of its position, Peak provided its well proposal and Mr. Gray's affidavit which stated, "[a]s a result of receiving Peak's well proposal, through telephone communication, the trustee of the Dr. Wood MD Family Trust and Peak were in communication regarding the Dr. Wood MD Family Trust's mineral interest in Section 20." The district court concluded Peak had established a prima facie showing on this issue and that

Bear had failed to show a genuine issue of material fact.

[¶54] Just as with the Davis Deal, Mr. Gray's assertion that Peak and the interest owner were in communication with each other is insufficient to establish a prima facie showing that the interest owner directly contacted Peak. Because a fact finder could infer either that Peak contacted the trust representative or the trust representative directly contacted Peak, a genuine issue of material fact exists as to whether Peak properly obtained this interest within the terms of the PSA.

### vi. Meagher Deal

 [¶55] Peak claimed it acquired a mineral interest from Meagher Oil & Gas Properties, Inc. (Meagher) after it had proposed a well, Meagher directly contacted Peak, and Bear had not been in previous contact with Meagher about the interest. In support of that argument, Peak provided a copy of its September 20, 2012 notice to Meagher regarding Peak's application for a permit to drill a horizontal well in an area in which Meagher owned a mineral interest, and Matthew Meagher's affidavit in which he stated he contacted Peak on October 16, 2012, about purchasing Meagher's interest in that section and that he had not contacted or been contacted by Bear about these interests. Peak also provided documentation showing that Meagher assigned its interests to Peak on January 31, 2013.

[¶56] Bear argued that an application for a permit to drill does not fall into the definition of "proposed a well" and, thus, Peak failed to make a prima facie showing that it was entitled to summary judgment on the claim. Although not discussed in its brief in opposition or in its Rule 56.1 statement, Bear submitted a March 26, 2013, e-mail from Mr. Gray (representing Peak) to Mr. Fling (representing Bear) with "Meagher acquisition" in the subject line. In the e-mail, Mr. Gray states: "Even though, technically, Peak was not proposing a well when this opportunity came about, we don't believe Bear Peak should be entitled to compensation under the AMI." Bear also argued that its answer to Peak's Interrogatory No. 12 (quoted *supra*, ¶ 43)

created a genuine issue of material fact regarding Bear's communication with Meagher:

### (VI) Meagher

Chris Fling talked with Janet Hawkins and Teri Williams in the Tulsa office, as well as Matt Mea[g]her, in 2011 and/or 2012. The conversations involve all of the properties Meagher had in the area, all of which Meagher had acquired in a single transaction or series of transactions. in close proximity to one another.

[¶57] The district court concluded Peak had made a prima facie showing for summary judgment in that it had proposed a well and that Bear had not produced any facts that showed it had any involvement in Peak's acquisition of the Meagher interests. We agree.

[¶58] Bear claims summary judgment for Peak on this transaction was improper because it believes an application for a permit to drill does not meet the definition of "proposed a well." This harkens back to Bear's argument that the phrase "proposed a well" has a specialized and technical meaning in the oil and gas field, yet Bear did not provide the district court or this Court with any specialized industry definition. As we previously concluded, the phrase "proposed a well" is clear and unambiguous and should be afforded its common everyday meaning. Peak's application with the Wyoming Oil and Gas Conservation Commission for a permit to drill a well indicated Peak had "proposed a well" under that phrase's common everyday meaning.

[¶59] Bear relies on the e-mail from Mr. Gray to Mr. Fling in which Mr. Gray states Peak was not "technically" proposing the well when the Meagher Deal came to light. Because the terms of the agreement are unambiguous and Bear has not presented the Court with any evidence that "proposed a well" has a specialized or technical meaning, this e-mail is simply extrinsic evidence Bear is attempting to use to create an ambiguity in the contract language. This Court refuses to consider extrinsic evidence to establish an ambiguity:

The ambiguity which justifies examining extrinsic evidence must exist . . . in the language of the document itself. It cannot be found in subsequent events or conduct of the parties, matters which are extrinsic evidence. The suggestion that one should examine extrinsic evidence to determine whether extrinsic evidence may be examined is circuitous.

*Wolter v. Equitable Resources Energy Co., Western Region*, 979 P.2d 948, 952 (Wyo. 1999) (quoting *State v. Pennzoil Co.*, 752 P.2d 975, 978 (Wyo. 1988)).

[¶60] Bear also argues that its interrogatory response creates a genuine issue of material fact because it shows that Bear had been in contact with Meagher. However, the response does not establish Bear was in "current conversations" with Meagher at the time Meagher directly contacted Peak in September of 2012. Instead, it is only a general statement that Bear had contact with Meagher in "2011 and/or 2012." This language does not even establish Bear likely had contact with Meagher at any time in 2012, let alone the time period in question. Bear claims that information found in unspecified e-mails and on an unidentified website shows that Bear was in communication with Meagher about the interests Peak obtained in this transaction. However, without more information this Court can only speculate that information regarding the interests in the Meagher Deal were included in the e-mails and on the website. "Speculation, conjecture, the suggestion of a possibility, guesses, or even probability, are insufficient to establish an issue of material fact." *Loredo*, ¶ 10, 212 P.3d at 619 (quoting *Hatton v. Energy Elec. Co.*, 2006 WY 151, ¶¶ 8-9, 148 P.3d 8, 12-13 (Wyo. 2006)). Because Bear's desired conclusion requires speculation on our part, Bear has failed to demonstrate a genuine issue of material fact and Peak was entitled to summary judgment on this claim.

### vii. Remaining Interests

[¶61] In its complaint, Bear's seventh claim related to a conglomeration of a handful of interests that are not otherwise accounted for in the individually discussed "deals." For each of these items, Bear believes Peak acquired an interest without compensating

Bear, in violation of the terms of the PSA. These interests are:

· 10 net acres in Section 10, Township 42 North, Range 74 West

· Possible acreage in Section 34, Township 44 North, Range 75 West

171 net acres in Section 3, Township 43 North, Range 75 West

### Section 10 acreage

 [¶62] Peak presented undisputed facts showing there were three separate interests and potential transactions in the ten net acres found in Section 10, Township 42 North, Range 74 West. With respect to the first interest, Peak demonstrated that, while it forced pooled the interests in the area, Bear acquired the first interest after forced pooling occurred and offered the interest to Peak. After Peak had terminated the AMI with Bear, Peak elected to purchase the interest from Bear, and Peak compensated Bear in accordance with the terms of the PSA. Peak referred to the second interest in Section 10 as the Heritage Interests. Just as with the first interest, Bear purchased the mineral interest after the interest had been subject to Peak's forced pooling. Bear then offered the interest to Peak, but Peak declined to purchase the interest. It is difficult to understand why Bear included these two claims in its complaint, and why Bear believes summary judgment in Peak's favor on these claims was improper. The undisputed evidence shows Peak paid Bear for the first interest in Section 10, and never acquired the second Section 10 interest. Because Bear did not present any argument in its brief other than the improper termination of the AMI as applied to these interests, we summarily affirm the district court's grant of summary judgment on these transactions. *Marshall v. State*, 2016 WY 119, ¶ 14, 385 P.3d 304, 308 (Wyo. 2016).

[¶63] Peak claimed it acquired the third and final interest in Section 10 after it had terminated the AMI with Bear, and, therefore, Bear is not entitled to compensation. The district court granted summary judgment on that basis. We concluded above that issues of material fact remain for trial on the question of whether Peak's early termination of the AMI was appropriate. Consequently, we reverse the summary judgment on this third interest in Section 10.

### Section 34 Acreage

 [¶64] Peak referred to the possible acreage in Section 34, Township 44 North, Range 75 West as the "Atomic Deal." Peak presented an affidavit from Mr. Gray stating that Bruce Johnston from Atomic Oil & Gas, LLC (Atomic), contacted Peak directly after Peak had proposed a well. Mr. Johnston also offered interests in other sections of land (Atomic Lands), including Section 3, Township 43 North, Range 75 West. Peak and Atomic entered into the Atomic Deal on November 1, 2013, approximately five months after Peak had terminated the AMI with Bear. The district court granted summary judgment in Peak's favor on this transaction because the transaction occurred after Peak terminated the AMI. Summary judgment was improper on the basis of Peak's termination of the AMI because, as discussed above, Peak did not make a prima facie showing that it properly terminated the agreement.

[¶65] While the district court relied on the termination of the AMI in granting summary judgment on the Atomic Deal, Peak also claimed summary judgment should be granted on this claim because it acquired the interests after proposing a well. We need not reverse and remand summary judgment on Bear's claim about this transaction if Peak presented a prima facie showing that it acquired the interest under the terms of the PSA, and Bear then failed to demonstrate any issues of material fact. *See Questar Exploration and Prod. Co. v. Rocky Mountain Res., LLC*, 2017 WY 10, ¶ 26, 388 P.3d 523, 530 (Wyo. 2017). Peak relied exclusively on Mr. Gray's affidavit to support its assertion that Atomic had contacted Peak directly after receiving Peak's well proposal and that Atomic had not been in current conversations with Bear. In paragraph 47 of his affidavit, Mr. Gray explained that Peak sent a well proposal to Atomic on March 20, 2013, and in paragraph 48 he states that Atomic contacted Peak directly. The only information regarding Atomic's lack of communication with

Bear is found in paragraph 49 of the affidavit, in which Mr. Gray states: "Mr. Johnston confirmed to me that he had not talked to Bear about the Atomic Deal (as hereinafter defined) and Bear had not contacted him or talked with him or discussed the Atomic Deal (as hereinafter defined) with him." The district court specifically disregarded this paragraph of Mr. Gray's affidavit on the basis of hearsay. Without this statement, the evidence does not establish that Bear was not in current conversation with Atomic. Peak failed to make a prima facie showing the Atomic Deal was properly acquired after proposing a well, and we must reverse the district court's grant of summary judgment on this transaction.

### Section 3 Acreage

■ [¶66] Bear's claim for compensation related to 170 acres in Section 3, Township 43 North, Range 75 West, 6th P.M., was not specifically discussed in the district court's order. Bear argues that the district court "appears to have disposed of them by its determination that the termination of the [AMI] was not wrongful, since the acquisitions occurred after the termination of the [AMI]." Peak argues the district court included this area in its discussion of the Atomic Deal because they are part of the Atomic Lands. We disagree with both parties' assessments of the order. The district court's order does not give any indication that it was including these particular interests in its discussion about the interests acquired after Peak had terminated the AMI. Further, the record would not support such a finding, as the record does not contain any information about when these interests were forced pooled by Peak. Additionally, while some interests in Section 3, Township 43 North, Range 75 West, 6th P.M. were part of the Atomic Lands and possibly were included in the court's findings regarding the Atomic Deal, Peak claimed that it had forced pooled 170 acres within that same legal description. That discussion is separate and distinct from the Atomic Deal. However, the district court granted summary judgment in favor of Peak on all of Bear's claims, including the claim about the 170 acres in Section 3. Based upon the record, Peak was entitled to summary

judgment with respect to that claim. Peak established that it simply forced pooled the interests in this area and did not actually acquire any mineral interests or compensation therefrom. Bear did not present any evidence to counter Peak's claim, and did not demonstrate a general issue of material fact. Because the undisputed facts show Peak did not acquire any mineral interest in these 170 acres, the PSA did not require any compensation to Bear. Summary judgment on this claim is affirmed.

### Implied Covenant of Good Faith and Fair Dealing

■ [¶67] In its complaint, Bear alleged Peak's conduct breached the implied covenant of good faith and fair dealing. Peak argued that its conduct always complied with the express terms of the PSA and, therefore, it could not have breached its duty. The district court agreed with Peak and concluded that Peak was always acting within its contractual rights. Further, the district court concluded Bear failed to present any evidence that Peak engaged in self-dealing or breached community standards of decency, fairness, or reasonableness in its actions. On appeal, Bear argues the district court's conclusion was improper for essentially three reasons: 1) Peak's forced pooling was not "consistent with the agreed common purpose and justified expectations of Bear;" 2) Peak acquired interests outside of avenues permitted by the PSA; and 3) Peak improperly terminated Bear from the AMI as a "pretext" to avoid the agreed upon terms of the PSA.

■ [¶68] Wyoming has adopted the Restatement (Second) of Contracts § 205 which states that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Scherer Const., LLC v. Hedquist Const., Inc.*, 2001 WY 23, ¶¶ 17-18, 18 P.3d 645, 652-53 (Wyo. 2001). We explained:

The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement. Compliance with the obli-

gation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party. A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance. The purpose, intentions, and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties. The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties. In other words, the concept of good faith and fair dealing is not a limitless one. The implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties. In the absence of evidence of self-dealing or breach of community standards of decency, fairness or reasonableness, the exercise of contractual rights alone will not be considered a breach of the covenant.

*Id.*, ¶ 19, 18 P.3d at 653-54 (internal citations and quotations omitted). The implied covenant of good faith and fair dealing is a claim separate and distinct from a breach of contract claim, and the two claims are not mutually dependent. *Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 25, 123 P.3d 579, 589 (Wyo. 2005). Thus, a party may breach the implied covenant of good faith and fair dealing even if it did not breach the express terms of the contract. *City of Gillette v. Hladky Const., Inc.*, 2008 WY 134, ¶ 41, 196 P.3d 184, 199 (Wyo. 2008).

[¶69] While Bear's complaints about Peak's behavior can be separated into the three categories stated above, the overarching allegation is that Peak breached the implied covenant of good faith and fair dealing because it engaged in conduct that was not permissible under the terms of the PSA—i.e. Peak breached the contract. As evidenced by this opinion, Peak has been able to sufficiently demonstrate that the vast majority of its mineral interests were properly acquired under the terms of the PSA and it is entitled to judgment as a matter of law. Not only did Peak not breach the terms of the PSA when it acquired these particular interests, it exercised its explicit right to do so as detailed in the terms of the PSA. In those circumstances, a claim of a breach of the implied covenant of good faith and fair dealing cannot lie. *Harper v. Fidelity and Guar. Life Ins. Co.*, 2010 WY 89, ¶ 34, 234 P.3d 1211, 1221 (Wyo. 2010) ("Under Wyoming law, a claim for breach of the implied covenant of good faith and fair dealing cannot exist where a party is simply exercising those right that they are contractually entitled to exercise."). Granted, Peak failed to make a prima facie showing that would have entitled it to summary judgment as a matter of law on some claims. However, the dispute in those claims simply is whether Peak breached the terms of the PSA. Peak's affidavits, although insufficient to establish who initiated communication, were sufficient to establish a prima facie case that Peak was attempting to exercise specific contract rights as opposed to intentionally interfering with Bear's performance. Bear has presented absolutely no facts that would support a conclusion that Peak engaged in self-dealing or when breaching the PSA also breached the community standards of decency, fairness or reasonableness. *See Scherer*, ¶ 19, 18 P.3d at 653-54.

[¶70] Further, Bear claims Peak breached the covenant when it did not inform Bear of its decision to engage in forced pooling. However, to find that the implied covenant imposed this requirement on Peak would create new duties the parties had not agreed to in the PSA. *Id.*, ¶ 19, 18 P.3d at 653. The terms of the PSA unambiguously allowed Peak to seek mineral interests in limited situations, and the terms of the PSA did not require Peak to disclose any potential acquisitions or actions to Bear beforehand. We are not willing to infer that Peak had a duty to discuss the acquisitions with Bear absent clear language in the PSA indicating that was the parties' intent. *See Whitlock Const., Inc. v. Big Horn County Water Supply Joint Powers Board*, 2002 WY 36, ¶ 25, 41 P.3d 1261, 1267-68 (Wyo. 2002). Therefore, the district court properly granted Peak summary judgment on this claim.

## Breach of Fiduciary Duty

[¶71] Bear argues the district court erroneously granted summary judgment in favor of Peak on Bear's claim that Peak breached its fiduciary duty to Bear. Bear claimed Peak owed Bear a fiduciary duty because the two were engaged in a joint venture and that Bear had placed special trust and confidence in Peak through the terms of the PSA. The district court concluded Peak did not owe Bear a fiduciary duty because the two were not engaged in a joint venture and the terms of the PSA did not otherwise create a fiduciary relationship. We agree with the district court's conclusion.

[¶72] "A fiduciary is defined as: 'A person having a duty, created by his own undertaking, to act primarily for another's benefit in matters connected with such undertaking.'" *Martinez v. Associates Financial Services Co. of Colorado, Inc.*, 891 P.2d 785, 790 (Wyo. 1995). We have acknowledged that a fiduciary relationship can arise in two instances. *Id.* at 789. The first arises from specific relationships, such as trustee/beneficiary and principal/agent. *Id.* (citing *Hoge v. George*, 27 Wyo. 423, 442, 200 P. 96, 102 (1921)). The second instance is "implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transaction." *Id.*

[¶73] Bear asserts that while the terms of the PSA itself did not explicitly state Bear and Peak were engaging in a joint venture giving rise to a fiduciary relationship, the parties' conduct and the surrounding circumstances established a joint venture and fiduciary relationship. "A joint venture is not a status created or imposed by law; it is a relationship voluntarily assumed and arising wholly from contract. Whether persons have engaged in it must depend primarily upon their intention as expressed in agreement and the construction they have placed upon it." *Resource Technology Corp v. Fisher Scientific Co.*, 924 P.2d 972, 978 (Wyo. 1996). Certain factors are essential to the creation of a joint venture:

(1) Each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a joint proprietary interest and right of mutual control over the subject matter of the enterprise; (4) usually, there is a single business transaction rather than a general and continuous transaction.

*Id.* (internal citations and quotations omitted). Joint ventures may be inferred from the parties' conduct, their transactions, and the surrounding circumstances, but must always include a promise to share in both the profits and losses and have an equal voice in control and direction of the undertaking. *Romberger v. VFW Post 1881,* 918 P.2d 993, 995 (Wyo. 1996).

[¶74] The facts and circumstances here clearly demonstrate the agreement between Bear and Peak was not a joint venture. There are no facts suggesting the parties intended to share the profits and losses, and the parties did not have an equal voice in control and direction of the agreement. In fact, the terms of the agreement are explicitly contrary to that conclusion. For example, the contract allowed Peak to decline to purchase any interest offered by Bear. Further, if Peak terminated the AMI, Peak could pursue any interests within the area it wished without owing compensation to Bear. Bear would not be obligated to seek interests in the AMI after termination; however, if it chose to do so it was required to offer those interests to Peak in compliance with Section 11.3. Peak also had all the control when it came to the termination of the AMI, so long as it did so in accordance with reasonable industry standards. While Peak could move to terminate the AMI if Bear was not performing as expected, the PSA did not offer Bear the same opportunity to terminate the agreement. Therefore, the terms of the PSA created an agreement giving Peak far more control over the direction of the endeavor than Bear, and Peak did not suffer the same loss risk as Bear. Thus, there was no joint venture.

[¶75] For these same reasons, Peak did not owe an implied fiduciary duty to Bear. While Bear argues that a fiduciary duty is implied because Bear was sharing confidential infor-

mation with Peak, there are absolutely no terms in the PSA that address any duties regarding confidential information. In fact, the terms of the PSA can only lead to the conclusion that Peak was never obligated to act primarily for Bear's benefit. This is completely opposite of the definition of a fiduciary and, therefore, a fiduciary relationship cannot be implied in these circumstances.

### Accounting

[¶76] In its final issue, Bear argues the district court erroneously granted summary judgment in favor of Peak on Bear's accounting claim. The district court determined that Bear was not entitled to an accounting because it had no viable claims to relief. Although we are remanding some of Bear's claims to the district court for further proceedings, Bear's accounting claim need not be considered. "An equitable claim for an accounting is not cognizable where an adequate remedy exists at law." *Haynes Trane Service Agency, Inc. v. American Standard, Inc.*, 51 Fed.Appx. 786, 800 (10th Cir. 2002) (citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962)). Bear's breach of contract claims are directed towards specific transactions and the parties are already aware how much Bear is entitled to if it prevails on each of those claims. Because an adequate remedy at law exists through the breach of contract claim, an accounting claim is unnecessary.

### CONCLUSION

[¶77] The district court properly granted Peak's motion for summary judgment on the breach of the implied covenant, breach of fiduciary duty, and accounting claims. The court also properly concluded the PSA was unambiguous. While the court accurately determined Peak was entitled to summary judgment on several of the individual breach of contract claims, genuine issues of material fact exist on the issues of whether Peak properly terminated the AMI, the Davis Deal, the Dr. Wood MD Family Trust Deal, the third interest in Section 10, Township 42 North, Range 74 West, and the Atomic Deal.

Therefore, we remand those claims to the district court for further proceedings.