FOX, Justice.
*541 [¶1] After a bench trial, the circuit court cancelled the mobile home sale between Respondent, Burton Construction, Inc., and Petitioner, Justin James Larson, finding that the parties made a mutual mistake in drafting their contract. On appeal, the district court reversed the circuit court's decision and found that Mr. Larson breached the contract. We granted Mr. Larson's petition for a writ of review. We affirm in part, reverse in part, and remand for further proceedings.
ISSUES
[¶2] We reframe the parties' issues as follows:
1. Did the district court erroneously overturn the circuit court's application of the doctrine of mutual mistake?
2. Did the district court err when it found that Mr. Larson breached the contract before Burton Construction, Inc.'s performance was due by making a clearly erroneous finding of fact, and as a matter of law?
FACTS
[¶3] In December 2015, Ken Burton, on behalf of Burton Construction, Inc.,[1] and Mr. Larson entered into a written contract (the Contract) in which Mr. Larson agreed to purchase from Burton a 2015 Skyline mobile home for $43,000. The Contract was a "form" contract, consisting of boilerplate provisions and blank lines on which parties could enter information. Mr. Larson's agent completed the form by hand, obtained Mr. Larson's signature, and delivered the document to Burton with $500 in earnest money. Burton went through the Contract carefully, made a few minor changes, and countersigned it.
[¶4] Although the Skyline mobile home was new and the parties intended to convey a new mobile home, the form was designed for the sale of a used mobile home. Thus, the Contract required Burton, as the "Owner" of the mobile home, to execute and deliver a Wyoming title at closing (handwritten portions in italics):
6. At closing, Owner shall execute and deliver a Wyoming title and Bill of Sale free and clear of all liens and encumbrances except: all will be free and clear .
7. Title shall be conveyed to the following named purchaser(s): Justin James Larson as Sole Owner . Title and the Bill of Sale shall be executed but escrowed if sold under contract.
8. Title shall be merchantable in the Seller, except as stated in this paragraph. Subject to payment or tender as above provided and compliance with other terms and conditions hereunder by Purchaser, the Seller shall execute and deliver a good and sufficient title in favor of those persons named in Paragraph 7 above, and a good and sufficient Bill of Sale, and deliver the same to said Purchaser at closing, which shall occur on or before January 15, 2016 , conveying said personal properties free and clear of all liens and encumbrances, except:
(a) Personal property taxes for 2016 , which shall be prorated to date of closing;
(b) Purchaser shall be responsible for sales tax, if any.
[¶5] Despite the Contract's clear language, Burton testified that it was not his custom to deliver a Wyoming title to purchasers of new mobile homes at closing. As a reseller, Burton did not take title himself. Burton would purchase the mobile home from the manufacturer with borrowed funds, and the manufacturer would deliver the mobile home with a Manufacturer's Certificate of Origin (MCO). The lender held the MCO as collateral until the mobile home was sold. At closing, Burton would use the purchaser's funds to repay the lender, and the lender would return the MCO. Burton would collect sales tax from the purchaser, submit it to the state, and *542 record the taxes as paid on the Bill of Sale. Under his reseller's tax exemption, Burton would pay no sales tax on his initial purchase from the manufacturer so long as he resold the mobile home directly to the consumer. After closing, Burton or the purchaser would bring the MCO and the Bill of Sale to the County Treasurer to issue a Wyoming title in the purchaser's name as the first assignee of the mobile home.[2]
[¶6] Accordingly, Burton never intended to deliver a Wyoming title to Mr. Larson at closing because "[t]hat's not how you do it." Burton testified that he "couldn't" deliver the Wyoming title at closing for three reasons. First, he would have to repay his lender in full to obtain the MCO necessary to issue title, which he presumably could not do before receiving Mr. Larson's purchase money. Second, if Burton obtained a Wyoming title before closing, he would become the first "owner" of the mobile home, which would require him to pay sales tax on his initial purchase of the mobile home from the manufacturer, and, because the State of Wyoming taxes only the first sale of a mobile home, Mr. Larson would pay no sales tax on his purchase from Burton.[3] Third, Burton testified that the manufacturer's warranty extended only to the first titleholder. Mr. Larson, as the second titleholder, would be deprived of the warranty.
[¶7] Burton's realtor, however, did not know the difference between an MCO and a Wyoming title. Thus, each time the escrow officer inquired, the realtor confirmed that Burton would deliver a Wyoming title for the closing. Based on the language of the Contract, confirmed by the realtor's assurances, the escrow officer expected Burton to deliver a Wyoming title at closing and therefore prepared settlement statements indicating that no sales tax was due from Mr. Larson.
[¶8] When the parties agreed to move the closing date forward by two days, the escrow officer and the parties' agents rushed to assemble the paperwork. Shortly before closing, for the first time, Burton instructed his realtor to pick up the MCO from his lender and bring it to the escrow officer. When Mr. Larson's agent arrived at closing, she discovered that Burton had provided an MCO instead of a Wyoming title, which added $1,806 in sales tax to Mr. Larson's purchase obligation. She called Mr. Larson, who was outside the building:
A. [Mr. Larson] ... She actually called me and told me what the deal was; that I was required to pay $1,800 more for sales tax that was never agreed upon anywhere, or had ever showed up on anywhere, even in our closing paper that we had.
And, I said, "Well, that's not what we agreed to. We agreed to the 43,000-something.
Q. [Burton's counsel] Well, did you ever look at the Contract and ask her about Page 2, Line 61, that said you promised to pay the sales tax at that point?
A. No, because I saw up here on the-What line is it?-like, 49 and 50, it says all will be free and clear. She'll deliver a Wyoming Bill of Sale and a, and a Title, and it will all be free and clear, meaning, to me, that there was nothing above and beyond after what we had agreed upon the price of the house.
I had to pay the closing cost and whatever. The only thing I would have to pay after that would be the ten or $15 at the Courthouse to transfer the Title from Mr. Burton's name to my name.
[¶9] Mr. Larson never entered the building. He cancelled the closing before Burton arrived, refusing to complete the sale upon the delivery of an MCO instead of a title. That same day, Mr. Larson sent a letter to Burton requesting the return of his earnest money and declaring the Contract null and void due to, among other things, Burton's failure to deliver a Wyoming title. Burton's attempts to reschedule the closing before the January 15 deadline failed. Mr. Larson would not close the sale without Burton providing a Wyoming title, which Burton would not do.
*543 [¶10] Burton brought suit in circuit court for breach of contract, seeking either specific performance or damages, as well as attorney fees and costs. After a bench trial, the circuit court found that the parties made a mutual mistake, cancelled the Contract, and ordered Burton to return Mr. Larson's earnest money. On appeal, the district court reversed, ruling that the circuit court erroneously applied the doctrine of mutual mistake, that it was "factually unknown" whether Burton delivered a Wyoming title at closing, and that Mr. Larson breached the Contract when he refused to attend closing and to pay sales tax. Pursuant to W.R.A.P. 13, we granted Mr. Larson's petition for writ of review.
DISCUSSION
I. Did the district court erroneously overturn the circuit court's application of the doctrine of mutual mistake?
[¶11] The district court held that the circuit court erred as a matter of law when it applied the doctrine of mutual mistake. We review a court's conclusions of law de novo. Ohio Cas. Ins. Co. v. W.N. McMurry Constr. Co. , 2010 WY 57, ¶ 14, 230 P.3d 312, 320 (Wyo. 2010). A court may reform or cancel a written contract that, due to a "mutual mistake" of the parties, does not accurately reflect the parties' true intentions. 66 Am. Jur. 2d Reformation of Instruments § 20 (May 2018 update) ; Lawrence v. City of Rawlins , 2010 WY 7, ¶ 14 n.4, 224 P.3d 862, 868 n.4 (Wyo. 2010) ; Hansen v. Little Bear Inn Co. , 9 P.3d 960, 964 (Wyo. 2000). To establish a claim of mutual mistake, the proponent must prove three elements by clear and convincing evidence: (1) there was a prior agreement that the written instrument undertook to evidence; (2) a mistake occurred in the drafting of the instrument; and (3) there was no fraud or inequitable conduct on the part of a party. Gumpel v. Copperleaf Homeowners Ass'n, Inc. , 2017 WY 46, ¶ 75, 393 P.3d 1279, 1299 (Wyo. 2017) (citing Mathis v. Wendling , 962 P.2d 160, 164 (Wyo. 1998) ). The mistake must be "reciprocal and common to both parties with each party being under the same misconception as to the terms of the written instrument." W.N. McMurry Constr. Co. , 2010 WY 57, ¶ 16, 230 P.3d at 320 (citation omitted).
[¶12] The circuit court found that the parties made a mutual mistake in drafting the Contract:
Testimony was offered as to the antecedent agreement of the parties. The Buyer, his agent and Seller knew that the purchase agreement was for a new mobile home. When reading the contract in its entirety [it] is ... clear that the contract contemplates the transfer of a currently titled or pre-owned mobile home.
[¶13] The district court determined that the circuit court improperly applied the doctrine of mutual mistake-a conclusion with which we agree. "Our first task ... is to define precisely the mutual mistake that is purportedly at issue." Gumpel , 2017 WY 46, ¶ 76, 393 P.3d at 1299. The circuit court identified the parties' antecedent agreement to be that the mobile home was new. The purported mistake was that the Contract contemplated the sale of a used mobile home. Whether the mobile home was "new" is not at issue. The purported mistake at issue is the process of the purchase transaction-in particular, whether the Contract mistakenly required either Burton to deliver a Wyoming title at closing or Mr. Larson to pay sales tax. The record contains no suggestion, let alone clear and convincing evidence, that the parties had an antecedent agreement as to the details of how ownership would be transferred to Mr. Larson. Specifically, the record does not show that prior to the Contract the parties had agreed that Burton would deliver an MCO or that Mr. Larson would necessarily pay sales tax on the transaction. With no prior agreement, the first element of a mutual mistake is unproven and we go no further. The district court correctly found that the circuit court erred as a matter of law.
II. Did the district court err when it found that Mr. Larson breached the contract before Burton Construction, Inc.'s performance was due by making a clearly erroneous finding of fact, and as a matter of law?
[¶14] Mr. Larson argued that Burton breached the Contract by failing to deliver a *544 Wyoming title at closing. The district court disagreed, concluding that it is "factually unknown" whether Burton delivered a Wyoming title at closing because Mr. Larson abandoned the closing before Burton arrived. The district court instead held Mr. Larson in breach, finding that he refused to attend closing and tender sales tax as required by the Contract.
[¶15] To prove a breach of contract, the proponent must show "a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of injured party to damages." Schlinger v. McGhee , 2012 WY 7, ¶ 12, 268 P.3d 264, 268 (Wyo. 2012), as amended on reh'g (Feb. 7, 2012) (quoting Reynolds v. Tice , 595 P.2d 1318, 1323 (Wyo. 1979) ). Here, the Contract is lawfully enforceable. Mr. Larson delivered the Contract to Burton with his signature and $500 earnest money as an offer to purchase the mobile home. Burton countersigned and accepted the earnest money, thus perfecting the Contract. Next, the Contract entitles a nonbreaching party to damages. Thus, to find a breach, we must interpret the Contract to identify each party's obligations and determine whether either party unjustifiably failed to perform as promised.
[¶16] Contract interpretation presents questions of law which we review de novo. Pope v. Rosenberg , 2015 WY 142, ¶ 21, 361 P.3d 824, 830 (Wyo. 2015).
The fundamental goal of contract interpretation is to determine the intent of the parties. Whitney Holding Corp. v. Terry , 2012 WY 21, ¶ 36, 270 P.3d 662, 673 (Wyo. 2012). The "language of the parties expressed in their contract must be given effect in accordance with the meaning which that language would convey to reasonable persons at the time and place of its use." Ultra Res., Inc. v. Hartman , 2010 WY 36, ¶ 22, 226 P.3d 889, 905 (Wyo. 2010) (quoting Moncrief v. Louisiana Land Exploration Co. , 861 P.2d 516, 524 (Wyo. 1993) ). This Court employs "common sense in interpreting contracts and ascribe[s] the words with a rational and reasonable intent." Id. , ¶ 22, 226 P.3d at 905. "When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties." Claman v. Popp , 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012) (citations omitted). "In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate." Id. (citation omitted).
Id . at ¶ 20, 361 P.3d at 830 (quoting Wallop Canyon Ranch, LLC v. Goodwyn , 2015 WY 81, ¶ 35, 351 P.3d 943, 953 (Wyo. 2015) ).
[¶17] There is no reason to venture beyond the four corners of the Contract to determine that Burton was required to deliver a Wyoming title at closing. The parties argued, and both lower courts found, that the Contract's language is unambiguous, and we agree.[4] The Contract states that closing must occur by January 15, 2016, at which time Burton must deliver a Wyoming title: "At closing, Owner shall execute and deliver a Wyoming title and Bill of Sale free and clear of all liens and encumbrances."
[¶18] On the other hand, the Contract also stated that Mr. Larson "shall be responsible for sales tax, if any." The words "if any" indicate that Mr. Larson's responsibility to pay sales tax is conditioned on sales tax being generated by the transaction. "Our rules of interpretation require that we interpret a contract as a whole, reading each provision in light of all the others to find their plain meaning." Pope , 2015 WY 142, ¶ 20, 361 P.3d at 830 (citations omitted). Here, the Contract plainly requires Burton's delivery of a Wyoming title. In this light, the Contract requires Mr. Larson to pay the sales tax associated with Burton's delivery of a Wyoming title. Accordingly, we conclude that Mr. Larson was not obligated to pay sales tax on the transaction, as none would be generated. To obtain a Wyoming title before closing, Burton would become the first *545 owner of the mobile home and would have to pay sales tax on his initial purchase of the mobile home from the manufacturer. The State of Wyoming taxes only the first sale of a mobile home. Wyo. Stat. Ann. § 39-15-101(a)(xiii)(B) (LexisNexis 2017); Wyo. Stat. Ann. § 39-15-103(b)(iv) (LexisNexis 2017). As the second titleholder, Mr. Larson would not be subject to "any" sales tax.
[¶19] Burton urges us to give the Contract's language its "full effect together in the context of a normal closing of the parties' contract for the sale of a new mobile home" (emphasis in original). Burton explains that the
contextual fair meaning of the parties' contract, evident from the contract itself, always was that the parties agreed formally to effectuate a sale and transfer of title and possession of a new mobile home with a manufacturer's warranty. Larson agreed to pay the sales tax on that sale. Burton agreed to collect the sales tax at closing from Larson and to then promptly effectuate the issuance of one certificate of title by the County Clerk to Larson with Larson's Bank's lien shown on it as a first lien.
[¶20] We have stated that
we will construe contract language "in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement to ascertain the intent of the parties at the time the agreement was made." Stone v. Devon Energy Prod. Co., L.P., 2008 WY 49, ¶ 18, 181 P.3d 936, 942 (Wyo. 2008). However, we will not "rewrite contracts under the guise of interpretation, and so long as there is no ambiguity, we are bound to apply contracts as they have been scrivened." Amoco Prod. Co. v. EM Nominee P'ship Co. , 2 P.3d 534, 540 (Wyo. 2000).
Comet Energy Services, LLC v. Powder River Oil & Gas Ventures, LLC , 2008 WY 69, ¶ 11, 185 P.3d 1259, 1263 (Wyo. 2008).
Pope , 2015 WY 142, ¶ 20, 361 P.3d at 830 (quoting Wallop , 2015 WY 81, ¶ 35, 351 P.3d at 953 ).
[¶21] "[C]ourts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable person in the position of the other contracting party would ascribe to the first party's manifestations of assent." 17A Am. Jur. 2d Contracts § 29 (May 2018 update). A reasonable layperson, such as Mr. Larson, would not be privy to a dealer's process of transferring title. Further, although parties to a contract are presumed to know the law, we do not attribute to them a complete understanding of the statutes governing sales of mobile homes. "According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them." Caballo Coal Co. v. Fid. Expl. & Prod. Co., 2004 WY 6, ¶ 11, 84 P.3d 311, 314 (Wyo. 2004) (citation omitted).
[¶22] While Mr. Larson testified that he knew he had contracted to purchase a new mobile home, we are unable to discern from the record that "new" meant anything more to Mr. Larson than that the mobile home had not been previously occupied. Although Burton testified that by obtaining a Wyoming title, the mobile home would no longer be "new," thus voiding the warranty to Mr. Larson; he also testified that he never discussed this concept with Mr. Larson. In fact, there is no evidence of any agreement regarding a warranty at the time the Contract was made: the listing agent could not say for sure that the online listing advertised the mobile home as having a warranty, and the Contract did not refer to a warranty. The only evidence that the parties discussed a warranty was testimony of a conversation that occurred during a walk-through of the mobile home after the Contract was signed, just before closing. "Our primary purpose is to determine the true intent and understanding of the parties at the time and place the agreement was made ." Pennaco Energy, Inc. v. KD Co. LLC , 2015 WY 152, ¶ 25, 363 P.3d 18, 25 (Wyo. 2015) (citations omitted) (emphasis added).
[¶23] Likewise, the record shows that Mr. Larson did not share Burton's unilateral intent to deliver an MCO, collect the *546 sales tax at closing, and "promptly effectuate the issuance" of a title. Although Burton apparently had it in his mind that he would follow his customary process of transferring ownership, he signed an enforceable contract that promised otherwise. "Because we use an objective approach to interpret contracts, evidence of a party's subjective intent is not admissible, regardless of whether the court determines a contract is ambiguous or clear." Ultra Res., Inc. v. Hartman , 2010 WY 36, ¶ 23, 226 P.3d 889, 905 (Wyo. 2010). We decline to rewrite the Contract to conform to Burton's subjective intentions.
A. Clearly Erroneous Finding of Fact
[¶24] We review a district court acting in its appellate capacity under the authority of Wyo. Stat. Ann. § 5-2-119 (LexisNexis 2017), which directs this Court to set the standards and extent of our review. Neither the rules of appellate procedure nor our caselaw addresses whether we should review factual findings of the district court under these circumstances and, if so, our level of deference. "Ordinarily, the review in the higher appellate court of the actions of the intermediate appellate court is limited to errors of law only." 5 C.J.S. Appeal and Error § 985 (June 2018 update). Nonetheless, we recognize that some issues involve mixed questions of law and fact; and, following a bench trial, we generally do not accept factual findings from the lower court that are clearly erroneous. E.g. , Gould v. Ochsner , 2015 WY 101, ¶ 16, 354 P.3d 965, 971 (Wyo. 2015). In civil cases, the United States Supreme Court follows the "two court rule," by which "the Court will not review findings of fact concurred in by two courts below in the absence of a very obvious and exceptional showing of error." 20 Charles A. Wright and Mary Kay Kane, Federal Practice and Procedure Deskbook § 115 (April 2018 update); see also Graver Tank & Mfg. Co. , v. Linde Air Products Co. , 336 U.S. 271, 275, 69 S.Ct. 535, 538, 93 L.Ed. 672 (1949). Likewise, we will not accept, without scrutiny, the findings of a district court that contradict the trial court and, if clearly erroneous in light of the record, we will disregard the findings.
[¶25] Here, the two courts below did not concur, and the record does not support the district court's conclusion that the circuit court erred. Specifically, the circuit court found that "[Burton's] agent did not appear with a title" at closing, and "[Burton] could not provide a title at closing as required by the contract." Nevertheless, the district court found that "whether or not Burton tendered a ... title, remains factually unknown." Burton's testimony refutes the district court's findings:
Q. [Mr. Larson's counsel] Okay. So, at any of these closings that you testified under Direct, under questioning from your attorney, at any of these closings did you bring a Wyoming Title?
A. [Mr. Larson] No.
....
Q. So, essentially we can agree that in none of these proposed closings did you bring a Wyoming Title.
A. On a new home, no.
....
Q. Okay. And, I guess at the risk of repeating myself, you never offered Mr. Larson any written or verbal communication to provide him with a Wyoming Title.
A. No.
Although Burton rescheduled the closing for January 15, he remained unwilling to deliver a Wyoming title. In preparation for the rescheduled closing, he directed the escrow officer to create a new settlement sheet showing an additional $1,806 in sales tax due from Mr. Larson, based on his planned delivery of an MCO. The record establishes that Burton neither delivered nor intended to deliver a Wyoming title before January 15. Thus, we set aside the district court's incompatible finding.
B. Breach as a Matter of Law
[¶26] Throughout the proceedings and on appeal, Burton argued that his obligation to deliver a Wyoming title at closing could be performed by delivering an MCO and a bill of sale, which could be presented to the County Treasurer for a title after closing. Burton rests his argument on the doctrine of substantial performance, which "allows a party that has substantially *547 complied with a contract to recover for its performance despite the fact that it has breached the contract by failing to comply fully with its terms." Bear Peak Res., LLC v. Peak Powder River Res., LLC , 2017 WY 124, ¶ 40, 403 P.3d 1033, 1047 (Wyo. 2017), reh'g denied (Nov. 7, 2017) (quoting 15 Williston on Contracts § 44:58 (4th ed. 2017) ). "The doctrine is rooted in fairness and 'is intended to protect a party's right to be compensated when it has performed in all material and substantive respects and to avoid the possibility of a forfeiture due to technical, minor, inadvertent, or unimportant deficiencies.' " Id. (quoting Williston , supra , § 44:52).
[¶27] We could find that Burton did not "substantially perform" his obligation to deliver a Wyoming title, as the added tax burden rendered the delivery of an MCO to be more than a "technical, minor, inadvertent, or unimportant" performance defect. Bear Peak Res., LLC , 2017 WY 124, ¶ 40, 403 P.3d at 1047. However, the doctrine of substantial performance is inapplicable here. Even though neither party argued for its application-and, even though it leads to the same result-we cannot ignore that Article 2 of the Uniform Commercial Code (UCC)[5] and the "perfect tender" rule govern the Contract. In Meuse-Rhine-Ijssel Cattle Breeders of Canada Ltd. v. Y-Tex Corp. , 590 P.2d 1306, 1309 (Wyo. 1979), the Court considered applicable provisions of the UCC in a breach of contract case where the parties had not called them to the attention of the district court. We determined that the UCC "became a part of the contract as though written into its terms." Id. (citing Tri-Cty. Elec. Ass'n, Inc. v. City of Gillette , 584 P.2d 995, 1007 (Wyo. 1978).) "There is no reason to keep secret the proper law applicable to a case just because overlooked." Id. Likewise, we decline to ignore the UCC where we are bound by statute to apply it.[6]
[¶28] The mobile home that Mr. Larson contracted to purchase is personal property and a "good" governed by the UCC. Wyo. Stat. Ann. § 34.1-2-105 (LexisNexis 2017) (" 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale ...."); Milnes v. Milnes , 2008 WY 11, ¶ 9, 175 P.3d 1164, 1168 (Wyo. 2008) (mobile homes are ordinarily taxed as personal property unless converted to real property, i.e. installed on a permanent foundation, under Wyo. Stat. Ann. § 31-2-502(b) ); Reposa v. Buhler , 770 P.2d 235, 238 (Wyo. 1989) (applying personal property measure of damages to a mobile home); see also Singletary, III v. P & A Invs. , Inc. , 212 N.C.App. 469, 712 S.E.2d 681, 685-86 (2011) ; Hensley v. Ray's Motor Co. of Forest City, Inc. , 158 N.C.App. 261, 580 S.E.2d 721, 723 (2003) ; Cooper v. Bluff City Mobile Home Sales, Inc. , 78 S.W.3d 157, 163 (Mo. Ct. App. 2002) ; Waggoner v. Town & Country Mobile Homes, Inc. , 808 P.2d 649, 653 (Okla. 1990). The UCC "does not rely on concepts of substantial performance, but instead requires that the seller make a perfect tender, meaning that the seller must tender goods that conform in all respects to those specified in the parties' agreement." 77A C.J.S. Sales § 273 (March 2018 update) (citing Pomerantz Paper Corp. v. New Cmty. Corp. , 207 N.J. 344, 25 A.3d 221, 231-32 (2011) ). In Wyoming, the perfect tender rule is found at Wyo. Stat. Ann. § 34.1-2-601 (LexisNexis 2017), stating in pertinent part: "if the goods or the tender of delivery fail in any respect to conform to the contract , the buyer may: (i) Reject the whole ...." (Emphasis added.) Generally, under the rule, "the buyer may reject a seller's tender for any trivial defect, whether it be in the quality of the goods, the timing of performance, or the manner of delivery." Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am. , 965 F.Supp. 1003, 1011 (W.D. Mich. 1997), aff'd , 165 F.3d 27 (6th Cir. 1998) (unpublished opinion).
[¶29] Here, the Contract plainly states: "At closing, Owner shall execute and deliver a Wyoming title and Bill of Sale free and clear of all liens and encumbrances." Delivering an *548 MCO that can be submitted to the County Treasurer for a Wyoming title after closing is not a perfect tender. The Contract unambiguously stated that the title was due "at closing"-not "promptly effectuated" afterward. Burton failed to perfectly perform his obligation to deliver a Wyoming title at closing under the plain terms of the Contract.[7]
[¶30] We note that the obligation of good faith limits a buyer's seemingly unhindered right to reject under the perfect tender rule. William H. Lawrence, Appropriate Standards for a Buyer's Refusal to Keep Goods Tendered by a Seller , 35 Wm. & Mary L. Rev. 1635, 1651 (1994) ("The perfect tender rule does not give buyers the power to seize upon the slightest contract deviation, even though it is not important to the buyer, as a pretext for discontinuing the contract .... The good faith requirement of the Code effectively prevents such improper strategic behavior, and thus assures that application of the perfect tender rule will occur only in those instances when it is invoked honestly." (citations omitted) ); see also generally Printing Ctr. of Texas, Inc. v. Supermind Pub. Co. , 669 S.W.2d 779, 784 (Tex. App. 1984) ; Y & N Furniture, Inc. v. Nwabuoku , 190 Misc.2d 402, 734 N.Y.S.2d 382, 385 (N.Y. Civ. Ct. 2001) ; Hubbard v. UTZ Quality Foods, Inc. , 903 F.Supp. 444, 451 (W.D.N.Y. 1995) ; Clark v. Zaid, Inc. , 263 Md. 127, 282 A.2d 483, 484 n.1 (1971). Under the UCC, "[e]very contract or duty within this act imposes an obligation of good faith in its performance and enforcement." Wyo. Stat. Ann. § 34.1-1-304 (LexisNexis 2017). Good faith includes "both the subjective element of honesty in fact and the objective element of the observance of reasonable commercial standards of fair dealing." 67 Am. Jur. 2d Sales § 433 (May 2018 update) ; Wyo. Stat. Ann. § 34.1-1-201 (LexisNexis 2017). Here, the law did not oblige Mr. Larson to pay sales tax upon Burton's delivery of a Wyoming title. See supra ¶18. As Mr. Larson testified, by accepting an MCO, "I was required to pay $1,800 more for sales tax that was never agreed upon anywhere." It was neither pretextual nor commercially unreasonable for Mr. Larson to reject the MCO as an imperfect tender, as Burton's delivery of an MCO added $1,806 to Mr. Larson's contractual obligation.
[¶31] Finally, we disagree with the district court that Mr. Larson's failure to attempt to close the sale constituted an unjustified failure to perform under the Contract. The parties' agents were present at closing, and Mr. Larson was outside. Mr. Larson's funds had been issued. Mr. Larson's agent left the closing, and Mr. Larson declined to enter, only because Burton and his agent failed to deliver or undertake delivery of a Wyoming title. Burton's further attempts to close the sale before January 15 consisted of insisting that Mr. Larson accept an MCO in the place of a Wyoming title.
[¶32] Mr. Larson argues that "Burton breached the contract, which breach excuses Mr. Larson's performance." We agree. The UCC, however, compels us to frame his refusal to close the sale in terms of anticipatory repudiation, which allows a party to suspend his own performance "[w]hen either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other." Wyo. Stat. Ann. § 34.1-2-610(a) (LexisNexis 2017). "[A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Id. , cmt. 1. Mr. Larson was justified to treat Burton's clear determination to deliver an MCO as a repudiation of Burton's contractual obligation to deliver a Wyoming title. In the face of Burton's ongoing repudiation, Mr. Larson justifiably abandoned the initial closing and refused to join Burton's subsequent attempts to close the sale before January 15.
*549 CONCLUSION
[¶33] We affirm the district court's reversal of the circuit court's finding of a mutual mistake of the parties. We reverse the district court's decision to hold Mr. Larson in breach of the Contract and conversely find that Burton breached the Contract. We remand for further proceedings consistent with this opinion.
KAUTZ, J., dissenting, in which DAVIS, C.J., joins.
[¶34] I concur with the majority's determination that the circuit court erred in concluding the parties' written contract mistakenly deviated from their actual prior agreement. The record does not show that prior to the written contract the parties had any specific agreement about the documents to be used in transferring title to Mr. Larson.
[¶35] I also concur that the parties made an enforceable contract, and that the evidence clearly establishes their intent. I do not agree, however, that the contract's language about the documents to be used in transferring title was unambiguous in the context of this case.
CONTRACT AMBIGUITY
[¶36] We have often said "[a] contract is ambiguous if indefiniteness of expression or double meaning obscures the parties' intent." Fleig v. Estate of Fleig , 2018 WY 30, ¶ 10, 413 P.3d 638, 642 (Wyo. 2018). However, we do not limit our analysis only to determinations of whether particular words in a contract are indefinite or have obvious double meaning. We recognize that a contract can also be ambiguous if the situation "otherwise makes the meaning of a provision doubtful or uncertain." In re Mark E. Dowell Irrevocable Trust #1 , 2012 WY 154, ¶ 22, 290 P.3d 357, 361 (Wyo. 2012).
[¶37] An ambiguity may arise from words which are plain in themselves but uncertain when applied to the subject matter of the instrument. Hokama v. Relinc Corp., 57 Haw. 470, 559 P.2d 279, 282 (1977). The terms of a contract may be definite and have no double meaning when read independently, but "otherwise make the meaning of a provision doubtful or uncertain" when provisions of the contract conflict with each other. The Michigan Supreme Court succinctly stated this obvious rule: "[I]f two provisions of the same contract irreconcilably conflict with each other, the language of the contract is ambiguous." Klapp v. United Ins. Grp. Agency, Inc., 468 Mich. 459, 663 N.W.2d 447, 453 (2003).
[¶38] A contract may be ambiguous "either as written or as a result of an ambiguity arising during performance of the agreement [.]" 11 Williston on Contracts § 30:4 (4th ed. 2018) (emphasis added). In other words, the ambiguity may be patent or latent. A patent ambiguity appears on the face of the instrument and arises from the defective, obscure, or insensible language used. Steuart v. McChesney, 498 Pa. 45, 444 A.2d 659, 663 (1982). Latent ambiguities arise from extraneous or collateral facts which render the meaning of a written contract uncertain although the language, on its face, appears clear and unambiguous. Z & L Lumber Co. v. Nordquist, 348 Pa.Super. 580, 502 A.2d 697, 700 (1985) ; Wolter v. Equitable Res. Energy Co., 979 P.2d 948, 952-53 (Wyo. 1999). Determination of whether a latent ambiguity exists necessarily involves consideration of some extrinsic evidence about the purpose and performance of the contract. A court, in making this determination, should hear the evidence presented by both parties and then decide whether "there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of differing meanings." Z & L Lumber Co., 502 A.2d at 700, citing Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir.1980).
[¶39] "A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings. To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation. Then, if a *550 latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue." Shay v. Aldrich , 487 Mich. 648, 790 N.W.2d 629, 641 (2010) (citations and footnotes omitted).
[¶40] Consideration of such extrinsic evidence is not forbidden in Wyoming. When we review contract terms, even for what we consider to be unambiguous contracts, we recognize "common sense and good faith" as the "leading precepts of contract construction." Polo Ranch Co. v. City of Cheyenne , 969 P.2d 132, 136 (Wyo. 1998). Both common sense and good faith considerations require knowledge of the circumstances under which the contract was created, as well as the circumstances of performance. "We have also recognized that the language of a contract is to be construed within the context in which it was written, and the court may look to the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made." Wadi Petroleum, Inc. v. Ultra Res., Inc. , 2003 WY 41, ¶ 11, 65 P.3d 703, 708 (Wyo. 2003).
AMBIGUITY IN THIS CONTRACT
Documents for Transfer
[¶41] The written contract in this case suffers from a latent ambiguity. The parties' contract stated that Burton would "execute and deliver a Wyoming title" in order to transfer the mobile home to Mr. Larson. Those words, read independently, appear to be definite and not subject to double meaning.[8] However, the evidence is unequivocal that the parties intended and required Burton to transfer a new mobile home with a new mobile home warranty. The evidence is equally unequivocal that it was impossible for Burton to give Mr. Larson an official Wyoming title and also transfer the mobile home as a new mobile home with a new warranty. Wyo. Stat. Ann. § 31-2-502(a)(i) and (iii) (LexisNexis 2017) states that "no certificate of title shall be issued ... for mobile homes ... held for sale by a Wyoming mobile home dealer." Our statutes state that Burton could not get a title, and the evidence established that in the trade dealers do not provide certificates of title for new mobile homes. Instead, Burton used the appropriate document for a dealer to transfer a new mobile home-a manufacturer's certificate of origin.[9]
[¶42] The circumstances surrounding this transaction indicate that the requirement for Burton to "execute and deliver a Wyoming title" had some other meaning than requiring an official certificate of title, because it was impossible for Burton to sell a new mobile home and provide such a document. It is equally as impossible to conclude that the contract required Burton to provide an official title. This inconsistency between the written language in the contract about the documents to be used to transfer ownership and the actual method used in these transactions is a latent ambiguity. As a result, we must look at the evidence to determine the parties' intent about the documents to be used.
Sales Tax
[¶43] The evidence indicates that Mr. Larson's true complaint with the process of closing on the purchase of the new mobile home was not with the documents used to obtain title, but instead with his obligation to pay sales tax associated with the transfer. He argues that the written contract his broker prepared required Burton to transfer the mobile home to him "free and clear," and that this requirement eliminates any obligation for Mr. Larson to pay sales tax. This position ignores the plain language in the contract stating Mr. Larson "will be responsible for sales tax, if any." This portion of the parties' contract is not ambiguous. It obligated Burton to provide "free and clear" title (without specifying the type of documents used), and obligated Mr. Larson to pay any sales tax associated with the transaction.
*551 There is no other reasonable interpretation of this language.
Uniform Commercial Code
[¶44] The majority opinion correctly points out the Uniform Commercial Code as adopted in Wyoming applies to this transaction, even though the parties did not present arguments based on the UCC. The majority concludes that the "perfect tender" statement of Wyo. Stat. Ann. § 34.1-2-601 (LexisNexis 2017) required Burton to provide a Wyoming certificate of title. Because he did not (and could not) the majority then concludes Mr. Larson was permitted to reject the transaction and terminate the contract.
[¶45] Other portions of the UCC, however, show that in this circumstance Mr. Larson was required to accept the manufacturer's certificate of origin as the document used to transfer title. Assuming the parties' contract actually required Burton to provide an official certificate of title, when the buyer (Mr. Larson) objected to the certificate of origin, the UCC then required the seller (Burton) be given the opportunity to cure the defect (§ 34.1-2-508) or to substitute (§ 34.1-2-504 and 614). The official UCC comment to § 34.1-2-504 addresses the exact situation present here, stating "when a prescribed document cannot be procured, a question of fact arises under the provision of the Article on substituted performance as to whether the agreed manner of delivery is actually commercially impracticable and whether the substitute is commercially reasonable." In this case, the evidence showed it was not just impracticable, but impossible, for a dealer to provide a title on a new mobile home. The evidence also showed that a manufacturer's certificate of origin was not only reasonable, but was the statutorily recognized method of transferring title on a new mobile home. Wyo. Stat. Ann. § 34.1-2-614(a) (LexisNexis 2017) goes on to state that the buyer (Burton) was required to accept the certificate of origin because it was the commercially reasonable method of transferring title. "Where without fault of either party the ... agreed manner of delivery ... becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted ." (Emphasis added.) Id .
Intent of the Parties
[¶46] The parties presented evidence of their intent at trial. The evidence is uncontroverted and uncomplicated. No evidence was presented indicating that either party anticipated or required that the transfer be accomplished by delivery of an official certificate of title. Rather, the clear intention of the parties was that Burton provide Mr. Larson with the necessary documentation for Mr. Larson to obtain a certificate of title, free and clear. The clear intention of the parties was that Mr. Larson would pay any sales tax associated with the transaction. The contract in this case should be interpreted in accordance with this obvious, uncontroverted intent. Any other interpretation results in a contract which is inconsistent within itself and impossible to perform. Using this interpretation of the contract, the evidence clearly establishes that Mr. Larson breached the contract.
Damages
[¶47] The district court computed damages in favor of Burton as part of its appellate review. As an appellate court, the district court should have remanded the matter of damages to the circuit court for computation.

For ease of reference, we will refer to Burton Construction, Inc. and its owner, Ken Burton, collectively as "Burton."

Burton's customary process of transferring ownership from the manufacturer to the first purchaser is authorized by Wyo. Stat. Ann. § 31-2-504(b) (LexisNexis 2017).

See Wyo. Stat. Ann. § 39-15-101(a)(xiii)(B) (LexisNexis 2017); Wyo. Stat. Ann. § 39-15-103(b)(iv) (LexisNexis 2017).

Because we find that the Contract is unambiguous, we do not address Burton's alternative argument that the Contract should be construed against Mr. Larson, as the drafter. See , e.g. , Collins v. Finnell , 2001 WY 74, ¶ 19, 29 P.3d 93, 100 (Wyo. 2001) (ambiguity is construed against the drafter).

Article 2 of the UCC is codified at Wyo. Stat. Ann. §§ 34.1-2-101 through 34.1-2-725 (LexisNexis 2017).

When asked by the Court at oral argument, neither party gave any reasoned basis to disregard the UCC.

It was not "impossible" for Burton to deliver a Wyoming title. Burton could deliver title by repaying his lender, obtaining the MCO, and submitting the MCO to the state in exchange for a Wyoming title, which he could then transfer to Mr. Larson. This would violate neither the Contract nor Wyoming law. It would, however, require Burton to pay $1,806 in sales tax. An expense of $1,806 does not rise to the magnitude of an actual commercial impracticability. 30 Williston on Contracts § 77:1 (4th ed.) (May 2018 update).

Wyo. Stat. Ann. § 31-2-501, et. seq. (LexisNexis 2017) recognizes an official document called a certificate of title for mobile homes.

Wyo. Stat. Ann. § 31-2-503 (a)(iii)(A) (LexisNexis 2017) requires use of a manufacturer's certificate of origin when a dealer sells a new mobile home.